COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



|  |  |  |
|---|---|---|
| IN THE INTEREST OF | § | No. 08-20-00181-CV |
|  | § | Appeal from the |
| J.A.V., | § | 65th District Court |
|  | § | of El Paso County, Texas |
| A MINOR CHILD. | § | (TC# 2019DCM5797) |
|  | § |  |

## **O P I N I O N**

Mother J.P.R. and Father E.V. appeal a trial court judgment terminating their parental rights to J.A.V. ("Child"). We affirm the judgment of the trial court.

## BACKGROUND

### *Factual History*

In August 2019, the Department received an intake alleging that Child, a newborn girl, had tested positive for opiates and was experiencing drug withdrawal symptoms that had to be treated with morphine.

Department Caseworker Erika Nieto investigated the intake. On August 15, 2019, Nieto went to the hospital and saw Child in the neonatal intensive care unit, but Nieto was unable to speak with Mother or Father, since neither of them were at the hospital at that time. Nieto was able

to speak with Mother three to five days later over the telephone, when Mother called Nieto to tell her that she "had every right to be pissed off that the Department had been called" and that "CPS could not have her baby." Nieto testified that Mother said Child tested positive for opiates because Mother had been prescribed Suboxone and that Mother's prescribing doctor would contact Nieto to confirm that information. Mother then hung up. Nieto testified that she attempted to contact Mother and Father in-person several times, but that Mother and Father would not cooperate and all contact with Mother and Father took place over text messages. Child was eventually discharged from the hospital before the Department could complete a relative placement evaluation.

On August 30, 2019, Nieto met with Mother in person at a hospital, where Mother said she was being treated for cutting her leg after falling off a toilet. Nieto said that during this meeting at the hospital, Mother admitted to using cocaine and hydrocodone. Nieto testified that she was eventually able to talk to Mother's treating physician, who confirmed that he had prescribed Suboxone to Mother to treat her addiction to heroin. Shortly after Nieto spoke to Mother's doctor, Mother revoked her medical release. Nieto testified that at one point during her visit to Mother at the hospital she observed Mother slumped over Child while she held Child, and Mother said that she knew "she shouldn't take Hydrocodone while holding the baby."

According to Nieto, Mother stated that she had depression and anxiety and needed to get her mental health "stabilized," and both Mother and Father told Nieto that they were going to check themselves in to University Behavioral Health for treatment. Nieto stated that Father had accused her of breaking into his home and leaving her business card inside, when she never did so, and Nieto testified that she did not know where either Mother or Father lived during the investigation. Nieto was never made aware of whether Mother or Father visited Child in the hospital, and Mother never expressed any concern about Child to Nieto. Nieto never saw Mother

speak to medical professionals about Child.

In September 2019, the Department sought a temporary managing conservatorship over Child because the Department was unable to find a suitable relative caretaker[1] and Mother and Father had not demonstrated they had a stable home. The trial court granted the Department's request for temporary managing conservatorship over Child on September 4, 2019. The trial court also issued an order implementing a service plan. The service plan required Mother and Father to, among other things, submit to random drug testing, obtain appropriate housing and stable employment, submit to psychological evaluation, and provide information regarding mental health providers if they sought services elsewhere. Canales testified that she first met Father at the adversary hearing, and that he informed her he was homeless at the time. Canales testified that neither Mother nor Father attended the initial service plan meeting, and Canales did not have direct contact information for Mother and Father. Canales said she would relay information through Father's mother, who would drive around to find them. On October 2, 2019, Mother and Father met with Canales, and both Mother and Father signed the service plan. Canales attended the initial visits between Child, Mother, and Father, but early in the process, Father requested that Canales contact him through email only, and she complied.

According to Canales, Mother did not participate in any of the court-ordered services and would not consent to any of the required monthly drug tests because she said she did not trust the Department's doctors. Canales testified that Mother claim to have submitted to a psychological evaluation with a private physician, but she did not provide a copy of the report, the doctor's contact information, or any other proof of the evaluation. Canales also testified that Father failed

---

[1] Child had older siblings that resided with Maternal Grandmother. According to a Department investigator, Maternal Grandmother did not have contact with Mother and Father because she did not want the children to have contact with them. While the Department initially arranged for Child to have sibling visits, Maternal Grandmother told the Department she did not want Child's older siblings to attend because they did not want to see Child.

to complete required monthly drug tests. Canales stated that Father insisted he had performed services required by the service plan, but he never provided any verification.

Canales testified that both Mother and Father said they were employed by a certain company, but when she went to confirm their employment, the business owner said Mother and Father were not employees. Father also said he had been employed by a roofing company. Canales called the roofing company, and an employee told her that while there was no current work available at the time, he would be called if jobs came up. Canales said that Mother told her she was seeking part-time employment at a nail spa, but she never provided Canales with any further information. Mother told Canales that she was renting an apartment, but when Canales went to visit the apartment, no one answered.

The record shows that from November 2019 through January 2020, Mother sought some mental health services. Juan Sierra, a licensed professional counselor intern with El Paso Behavioral Health Systems (EPBH), testified that Mother had been admitted to EPBH a "handful of times," and that he worked with her personally during her June-July 2019 and November 2019 inpatient admissions. Sierra testified that during her June-July 2019 admission prior to Child's birth, Mother was detoxing and actively withdrawing from heroin. During withdrawal, Mother would be "out of it" for two or three days at a time before being able to engage with services. Sierra also testified that Father sought treatment around the same time as Mother. Following Child's birth, Sierra provided counseling services to Mother for seven days in an inpatient setting in November 2019; however, the treatment plan did not include parenting instructions or a drug/alcohol assessment. According to Sierra, Mother admitted during this treatment that she was still suffering from chemical dependency. Sierra testified that Mother also sought treatment from EPBH in January 2020, though he did not personally treat her.

4

Toward the beginning of this case, Mother and Father visited Child, and Canales testified that at visitation, she observed Mother and Father behave lovingly toward Child, but that they could also be "emotional" at times. She recounted one instance where Mother was "very upset and confrontational" and indicated that she would not give the Child back, although she ultimately did.

In March 2020, the COVID-19 pandemic began taking hold in El Paso. Canales testified that once the COVID-19 pandemic began in March and April of 2020, Mother and Father said they could not participate in virtual visits with Child because they did not have a smartphone. Canales testified that, in her opinion, even without a smartphone Mother or Father could have accessed technology at the public library that would have allowed them to participate in virtual visits, and that bus fare was waived during that period of time. Canales also said that Mother and Father could have called Child on the phone so Child could hear their voices, but they did not do so.

Mother and Father's landlord testified that Mother and Father had resided at an apartment rented to them by the landlord's son, who met Mother and Father while at a rehab hospital, from December 2019 to April 2020. The landlord stated that his son was not authorized to rent the apartment to Mother and Father, and Mother and Father never paid rent, so after he requested they leave the property multiple times, the landlord had Mother and Father legally evicted from the premises in April 2020. The landlord further testified that Mother and Father had damaged the apartment by breaking faucets and toilets and filling a bathtub full of items like clothing, boxes, and dishes and then leaving the water running, which resulted in $3,000 worth of water damage.

According to Canales, she tried to work with Mother and Father to resume in-person visits in May 2020, but Mother became "very hostile and very aggressive" and said Canales was attempting to "trick them into visitations" or otherwise would not work with their schedules. Canales testified that in June 2020 she tried to set up in-person visits between Child and Mother

and Father, but Mother and Father did not visit, nor did they explain why they did not visit. Mother and Father did visit with Child on August 4, 2020, a few weeks before trial. However, according to Canales, Mother and Father refused to participate in video visits over Google Duo while Child was traveling even though at that point they had a smartphone and knew how to use Google Duo.

Canales testified that Child has been in her foster care placement since September 2019, that all her needs were being met in the home, that she is bonded with her foster family, and that while Child is receiving early childhood intervention services for developmental therapy and skills training, Child is doing "very well and she's walking, very active, babbling a lot, and a very healthy little girl." The Department's plan for Child was to have Child remain with her foster family in the event of a parental termination.

### *Procedural History*

Trial in this matter took place on August 12, 2020, over videoconference in accordance with the Texas Supreme Court's then-applicable COVID-19 emergency directives. *See generally* Twenty-Second Emergency Order Regarding the COVID-19 State of Disaster, Misc. Dkt. No. 20-9095 (Tex. Aug. 6, 2020). Mother and Father both appeared via videoconference, but neither one offered any testimony during the hearing.[2]

Following the hearing, the trial court entered a termination order as to Mother pursuant to Subsections 161.001(1)(b)(E), (N), (O), and (P) and as to Father pursuant to Subsections (E), (N), and (O). The order found that termination was in Child's best interest.

This consolidated appeal from Mother and Father followed.

### DISCUSSION

---

[2] Comments made on the record by the trial judge indicate that both Mother and Father may have been sleeping intermittently throughout the proceedings. The trial court admonished them twice to stay awake during the videoconference hearing and to not sleep.

6

In their respective appeals, Mother contends the evidence is legally and factually insufficient to support termination because the Department failed to establish a causal link between her drug use and danger to Child, and Father contends the evidence is legally and factually insufficient to support termination as to him because Mother's conduct in using drugs cannot be imputed to him. The Department argues that based on the totality of the circumstances both before and after Child's birth, there was ample legally and factually sufficient evidence to terminate both Mother and Father's parental rights on endangerment grounds under Subsection (E).

We agree with the Department.

### *Standard of Review and Applicable Law*

The natural right of a parent to the care, custody, and control of their children is one of constitutional magnitude. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see also Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982)(acknowledging that a parent's rights to "the companionship, care, custody, and management" of their children are constitutional interests, "far more precious than any property right"). However, although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id*.

Parental rights may be involuntarily terminated through proceedings brought under Section 161.001 of the Texas Family Code. *See* TEX.FAM.CODE ANN. § 161.001. We review parental rights termination appeals under the clear and convincing evidence standard. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). When reviewing the legal sufficiency of the evidence in a termination case, we consider all of the evidence in the light most favorable to the trial court's finding, "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was

7

true." *Id*. [Internal quotation marks omitted]. We give deference to the fact finder's conclusions, indulge every reasonable inference from the evidence in favor of that finding, and presume the fact finder resolved any disputed facts in favor of its findings, so long as a reasonable fact finder could do so. *Id*. We disregard any evidence that a reasonable fact finder could have disbelieved, or found to have been incredible, but we do not disregard undisputed facts. *Id*.

In a factual sufficiency review, the inquiry is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the challenge findings. *See In re K.A.C.*, 594 S.W.3d 364, 372 (Tex.App.—El Paso 2019, no pet.). We must give due consideration to evidence that the fact finder could reasonably have found to be clear and convincing. *Id*. A court of appeals should consider whether disputed evidence is such that a reasonable fact finder could not have resolved that disputed evidence in favor of its finding. *Id*. If the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id*.

To obtain termination of parental rights, the petitioner must (1) establish one or more of the statutory acts or omissions enumerated as grounds for termination, and (2) prove that termination is in the best interest of the children. *Id*. at 371. Section 161.001(b)(1) of the Texas Family Code sets out the list of predicates for terminating parental rights. Although the existence of one predicate ground is sufficient to uphold the termination of parental rights on appeal, the court of appeals must still always review the sufficiency of any findings made under Subsections (D) or (E) predicates as part of due process, since those findings can affect a parent's right to be a parent to their other children. *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019). Since the trial court cited Subsection (E) as a ground for terminating both Mother and Father's parental rights,

8

we being our analysis with the legal and factual sufficiency of the Subsection (E) findings.

The court may order termination of the parent-child relationship under Subsection (E) if there is clear and convincing evidence the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. TEX.FAM.CODE ANN. § 161.001(b)(1)(E). "Endanger" means "to expose to loss or injury; to jeopardize." *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996)[Internal quotation marks omitted]. Although "endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Id*. "It is enough if the youth is exposed to loss or injury or his physical or emotional well-being is jeopardized." *In re P.E.W.*, 105 S.W.3d 771, 777 (Tex.App.—Amarillo 2003, no pet.).

The relevant inquiry under Subsection (E) is whether evidence exists that the endangerment of the child's physical and emotional well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See In re K.A.C.*, 594 S.W.3d at 372–73. Termination under this subsection must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id*. When determining whether a parent has engaged in an endangering course of conduct, a fact finder may consider the parent's actions and inactions that occurred both before and after the child was born, and before and after the child has been removed by the Department. *Id*. The conduct may occur outside the child's presence. *Id*.

### Mother's Appeal

In her appeal, Mother contends the evidence was legally and factually insufficient to support termination of her parental rights because although the Department established that Mother

9

used drugs, the Department did not establish that her drug use endangered Child. We disagree. The Department has shown that Mother's use of drugs during pregnancy and after Child's birth, along with Mother's other conduct, meets the sufficiency standard for endangerment.

A parent's use of narcotics and its effects on his or her ability to parent may qualify as an endangering course of conduct under Subsection (E). *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). Illegal drug use during pregnancy specifically can also support a charge that the mother has engaged in conduct that endangers the physical and emotional welfare of the child. *See In re M.B.*, No. 02-15-00128-CV, 2015 WL 4380868, at *12 (Tex.App.—Fort Worth July 16, 2015, no pet.)(mem. op.).

Here, Mother contention that the Department failed to establish a causal connection between her drug use and danger to Child as required under Subsection (E) is belied by the record on appeal. *See In re L.C.L.*, 599 S.W.3d 79, 84 (Tex.App.—Houston [14th Dist.] 2020, pet. filed)(stating that causal connection must be made between drug use and harm to child). However, the record establishes a continued pattern of harmful drug abuse both before and after Child's birth.

Two months before Child's birth, Mother was admitted into a heroin detox treatment program while pregnant, and Juan Sierra of EPHB testified that at the time of her admission, Mother was under the influence of drugs and in a state of active withdrawal. Because of Mother's drug abuse during pregnancy, Child was born in a state of opiate withdrawal and had to be treated with morphine. The causal connection between Mother's actions during pregnancy and direct physical endangerment to Child is clearly established under these circumstances. *See In re M.B.*, 2015 WL 4380868, at *12 (illegal drug use during pregnancy can support endangerment finding).

Additionally, after Child's birth, Mother admitted to taking cocaine and hydrocodone when Canales met her at a hospital after Mother cut her leg when she fell off a toilet, and Canales testified

that she witnessed mother "slumped" over Child during that hospital visit saying that she knew she should not be taking hydrocodone while caring for Child. Sierra also testified that when Mother was in withdrawal from heroin, she was "out of it" for two or three days, which serves as additional evidence that her use of drugs presented a danger to Child, a newborn who was unable to care for herself and would be highly dependent on Mother. This testimony regarding continued drug use, coupled with Child's at-birth addiction to opiates as the result of Mother's use of illegal drugs during pregnancy, would further bolster an inference that Mother's drug use continued to endanger Child by affecting Mother's ability to parent.

The record also establishes a pattern of instability that would endanger Child's well-being. Mother's older children reside with Maternal Grandmother, not Mother. Maternal Grandmother eventually stopped visits with Child based on the wishes of Mother's older children, who said they did not want to see Mother. The fact that Mother does not have custody of her other children and that her other children did not want to see her supports an inference of endangerment when raised against the backdrop of Mother's drug abuse.

Both Mother and Father's housing arrangement were apparently unstable through the course of the investigation. While both Mother and Father told the Department they were going to enter in-patient mental health treatment programs, the Department was never able to confirm if Mother and Father actually participated because they were unable to obtain releases. Mother and Father were evicted from their apartment in April 2020, and according to their landlord, Mother and Father caused $3,000 worth of water damage prior to leaving by filling the bathroom tub with items and leaving the faucet running. The Department was unable to determine whether Mother or Father had a permanent residence following their eviction, and at the trial court hearing, neither Mother nor Father offered any evidence showing stable housing. The trial court could take these

11

factors into consideration in conducting its endangerment analysis.

Finally, a parent's inconsistent visitation may also be considered as part of the endangerment analysis, as can the parent's failure to participate in a service plan. *See In re R.M.*, No. 07-12-00412-CV, 2012 WL 6163100, at *4 (Tex.App.—Amarillo Dec. 11, 2012, no pet.)(mem. op.)(considering inconsistent visitation as part of endangerment analysis due to potential emotional consequences to child); *In re M.B.,* 2015 WL 4380868, at *12 (considering failure to complete service plan as part of endangerment analysis).

The Department argues that Mother and Father's failure to visit Child from March to August 2020, either in-person or through virtual means, bolsters the trial court's endangerment finding. Complicating matters here is the existence of civic lockdowns, social distancing requirements, and logistical challenges presented by the COVID-19 pandemic during that period of time. The Department does acknowledge that the COVID-19 pandemic, which was taking hold in El Paso in March, presented logistical challenges to in-person meetings, and the Department did not dispute Mother and Father's representations that they initially did not have access to a smartphone in order to participate in virtual visits. However, at the termination hearing, Caseworker Canales asserted that Mother and Father could have taken public transit to a public library and accessed the technology necessary to participate in videoconference calls with Child. The Department relies on this statement to support its assertion that Mother and Father did not make an effort to participate in virtual visits when they had the means to do so.

However, Canales' statement that Mother and Father could use public transit to access technology at the library is factually inaccurate and does not match with the historical record of events in El Paso beginning in March 2020. *See County of El Paso v. Navar*, 584 S.W.3d 73, 77-78 (Tex.App.—El Paso 2018, no pet.)(appellate court may take judicial notice of matters of public

record that are not subject to reasonable dispute because they can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned). On March 18, 2020, at 5 p.m., the City of El Paso closed all of its libraries, and the physical premises of all El Paso libraries remained closed through May 2020.[3] Indeed, as of the date of this opinion's release, the physical premises of El Paso's public libraries remain closed to the general public.[4]

Canales' statement that Mother and Father could have gone to the library to participate in virtual visits is readily contradicted by irrefutable evidence in the public record showing that El Paso's library system has remained physically closed to the general public since March 18, 2020. As such, it constitutes no evidence in support of termination, and the Department's reliance on this statement to support termination undermines its appellate argument. We hold that, on this record, Mother and Father's inability to participate in visits during March and April due to social distancing restrictions and lack of access to technology that would allow virtual visits constitutes no evidence in support of termination.

That said, while we do not believe there is sufficient evidence to show Mother and Father's failure to participate in "virtual visits" during El Paso's first COVID-19 lockdown was deliberate or intentional and not the result of mere circumstance, we agree with the Department that Mother and Father's failure to participate in other facets of the plan could constitute sufficient evidence in

---

[3] *See* Molly Smith, *March 18 COVID-19 updates: El Paso Diocese cancels Mass, including weddings and funerals*, El Paso Times, Mar. 18, 2020, at https://www.elpasotimes.com/story/news/2020/03/18/coronavirus-covid-19-march-18-el-paso-texas-updates-closures-cancellations/5075837002/ (detailing various COVID-19 closures in El Paso, including the closure of all El Paso libraries); Michael Gordon, *As El Paso businesses reopen, avid readers wonder when libraries will open back up*, KVIA.com, May 19, 2020, https://kvia.com/news/el-paso/2020/05/19/as-el-paso-businesses-reopen-avid-readers-wonder-when-libraries-will-open-back-up/.

[4] We also note that on March 24, 2020, in response to the emergence of the COVID-19 pandemic, El Paso County Judge Ricardo Samaniego issued El Paso County Emergency Order No. 7, which ordered all individuals living within the County of El Paso to temporarily stay at home or at their place of residence and prohibited all travel unless that travel was incident to the performance of certain specifically enumerated "Essential Activities." *See* https://www.epcounty.com/documents/Order%20No.%207%20County%20Judge%20Stay%20Home%20Work%20Safe%20Order.pdf

support of termination, even in light of logistical challenges presented by COVID-19. The Department did show that Mother and Father only met with Child once in person in August shortly before trial, and even after obtaining a smartphone, Mother and Father did not answer Google Duo calls made to them so that they could have face-to-face contact with Child while Child was traveling. The Department also demonstrated that Mother and Father failed to comply with other elements of the service plan such as drug testing requirements, and neither Mother nor Father offered any evidence or testimony that would counter the Department's evidence or otherwise explain or excuse their non-compliance with the service plan.

In sum, the Department cannot establish on this record that Mother and Father's failure to visit with Child during the beginning stages of the COVID-19 pandemic lockdown constituted legally or factually sufficient evidence of endangerment based on El Paso county's shelter-in-place order that physically restricted travel and prevented Mother and Father from accessing virtual visit technology at local libraries. However, the evidence was sufficient to support termination on Subsection (E) endangerment grounds as to Mother based on other factors. Her use of drugs during pregnancy caused Child direct harm at birth. Her continued use of drugs called into question her fitness to parent a newborn. Her housing arrangements remained unstable. Her older children did not reside with her and purportedly did not wish to have contact with her. Mother did not make any consistent efforts to comply with the court-ordered service plan even prior to COVID-19 restrictions. Finally, she did not offer any evidence excusing or explaining her actions, and she did not speak at the hearing or otherwise indicate that she wished to retain her parental rights to Child.

Based on this evidence, we find that the Department established by clear and convincing evidence that Mother engaged in a course of endangering conduct. The trial court's Subsection (E) predicate finding against Mother rested on legally and factually sufficient evidence.

14

Because the evidence was sufficient to support termination of Mother's parental rights on Subsection (E) grounds, we decline to address the remaining alternate grounds supporting termination as unnecessary to the resolution of this appeal. *See In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019)(court of appeals may affirm termination judgment on appeal so long as one termination ground finding and the best interest finding are based on sufficient evidence).

### *Father's Appeal*

In his appeal, Father also argues that the evidence was legally and factually insufficient to terminate his rights on Subsection (E) endangerment grounds. He acknowledges that Child's addiction to opiates at birth would support a reasonable finding that Mother used drugs during her pregnancy, but he maintains that Mother's conduct cannot be imputed to him because the Department did not offer clear and convincing evidence showing Father knew Mother was using opiates while she was pregnant, that Father and Mother were together prior to Child's birth, or that Father was aware of Mother's CPS history.[5]

However, Father casts the scope of review too narrowly here. As the Department points out, Sierra testified that Father also received treatment at EPBH at the same time Mother did, and Father also admitted to using illicit drugs. Thus, the trial court could infer that Father was aware of Mother's drug use during and after pregnancy and take that into consideration as part of its endangerment analysis.

Further, separate and apart from Mother's conduct, Father refused to undergo drug testing or comply with the service plan as detailed previously in this opinion. Like Mother, Father did not

---

[5] The Department first asserts that while Father attacked the Subsection (E) ground on appeal, he failed to attack the alternate Subsection (N) and (O) grounds on which the trial court's termination judgment rested in his brief. As such, the Department urges us to affirm the termination judgment based on Father's implied concession that Subsection (N) and (O) grounds were sufficient to support termination of his parental rights. However, we are required under due process to always review the sufficiency of a Subsection (E) grounds. *See In re N.G.*, 577 S.W.3d at 237. As such, we will conduct a Subsection (E) analysis.

participate in virtual visits with Child. He and Mother were evicted from their home in April 2020 for nonpayment of rent. These factors taken in concert with evidence sufficient to impute knowledge of Mother's drug use onto father are enough to sustain the trial court's endangerment finding. The evidence is legally and factually sufficient to show the existence of a predicate ground for termination of Father's rights under Subsection (E).

### *Best Interest*

Having determined that legally and factually sufficient evidence undergirded the trial court's Subsection (E) endangerment findings as to both Mother and Father, we turn to the question of whether parental rights termination is in Child's best interest. We address the best interest factor jointly as to Mother and Father.

The existence of a predicate termination ground is not enough to allow a trial court to order termination of parental rights; termination of parental rights must also be in the child's best interest. *See In re B.C.S.*, 479 S.W.3d 918, 923 (Tex.App.—El Paso 2015, no pet.). A determination of best interest necessitates a focus on the child, not the parent. *See id*. at 927. There is a strong presumption that it is in the child's best interest to preserve the parent-child relationship, but that presumption may be rebutted. *Id*. Nine non-exhaustive factors should be considered in our analysis of the best interest issue:

    1. the child's desires;

    2. the child's emotional and physical needs now and in the future;

    3. the emotional and physical danger to the child now and in the future;

    4. the parenting abilities of the individuals seeking custody;

    5. the programs available to assist those individuals to promote the child's best interest;

    6. the plans for the child by those individuals or the agency seeking custody;

7. the stability of the home or proposed placement;

8. the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one; and

9. any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976)("the *Holley* factors").

The Department is not required to prove all of the *Holley* factors as a condition precedent to parental-rights termination. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). We also must bear in mind that permanence is of paramount importance in considering a child's present and future needs. *In re B.C.S.*, 479 S.W.3d at 927. While no one factor is controlling, analysis of a single factor may be adequate in a particular factual situation to support a finding that termination is in the best interest of the child. *In re J.O.C.*, 47 S.W.3d 108, 115 (Tex.App.—Waco 2001, no pet.).

Analyzing the issue of best interest through the prism of *Holley*, we find that the trial court's decision that termination is in Child's best interest is supported by the record.

*Child's Needs (Factors #1 and #2), Danger to Child (Factor #3), and
Parental Acts and Omissions (#8 and #9)*

We will group our discussion of the child's desires (Factor #1), the child's emotional and physical needs (Factor #2), the emotional and physical danger to the child (Factor #3), and parental acts and omissions that may indicate that the existing parent-child relationship is not proper (Factor #8) along with any excuses for parental acts or omissions (Factor #9) together.

At the time of trial, Child was one year-old and was thus not capable of articulating any desire to remain with her parents or with her foster family. However, when a child is too young to articulate desires, we may consider the quality and extent of the child's relationships with the prospective placements as part of our *Holley* Factor #1 assessment. *See L.Z. v. Tex. Dep't of Family & Protective Srvs.*, No. 03–12–00113–CV, 2012 WL 3629435 (Tex.App.—Austin Aug. 23, 2012,

17

no pet.)(mem. op.). Caseworker Canales testified that Child's foster parents were loving and nuturing and that Child is bonded with them. This factor weighs in favor of termination.

The trial court was also free to consider Mother and Father's past actions and omissions in assessing potential future emotional and physical danger to Child. The record shows that both parents have had issues with drug abuse. Both parents' past behaviors indicate the serious potential for future danger to Child, who is still at a developmentally tender age and highly dependent on caretaker attention. Neither parent testified or offered any explanation or excuse for past actions or indicated an intent or willingness to change their behavior. These factor weighs in favor of termination.

*Plans for Child (#6) and Stability of Proposed Placement (#7)*

The Department's ultimate plan is for termination to proceed so that Child may be adopted by her foster parents. The evidence shows that Child is being cared for by a foster family and is awaiting an adoption placement. This factor weighs in favor of termination.

### CONCLUSION

The Department has established that Mother and Father both engaged in a course of endangering conduct necessary to trigger the Subsection (E) predicate for termination of their parental rights to Child. The Department has also shown that termination is in Child's best interest. Consequently, we find no reversible error. The judgment of the trial court is affirmed.

January 29, 2021

YVONNE T. RODRIGUEZ, Chief Justice

Before Rodriguez, C.J., Palafox, J., and McClure, C.J. (Senior Judge)
McClure, C.J. (Senior Judge)(Sitting by Assignment)

18