COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| | § | No. 08-15-00084-CV |
| | § | Appeal from |
| IN THE INTEREST OF B.C.S., | § | 65th District Court |
| A MINOR CHILD. | § | of El Paso County, Texas |
| | § | (TC # 2012DCM10290) |

## O P I N I O N

This is an appeal from an order terminating the parental child relationship between B.C.S., who was seven years' old at the time of trial, and his father. Mother's rights were also terminated but she has not appealed. For the reasons that follow, we reverse and remand.

### FACTUAL SUMMARY

Father is originally from Massachusetts. B.C.S. was born on October 19, 2007. His parents were involved in a short-term relationship when Mother became pregnant. At that time, Father entered military service and returned shortly before the child was born. The couple then married and Father was deployed. The couple divorced at some point and while the record is unclear, it appears Mother was awarded the Texas equivalent of managing conservatorship. In early 2010, she began having serious issues and was incarcerated. Father obtained temporary custody through the Middlesex County Family and Probate Court. His mother, the child's

paternal grandmother, cared for B.C.S., who was only two years old, for approximately two months until Father, who was serving in the Army in Korea, was able to return stateside. He and his son then moved to Texas as Father was transferred to Fort Bliss in El Paso. At some point during his military service, Father suffered a traumatic brain injury that affected his ability to control his anger and he was discharged from the service.

The record reveals that on July 24, 2012, an intake was received alleging neglectful supervision of B.C.S. by his father and step-mother, K.S.[1] B.C.S. reported that his step-mother pushed him off of the bed and that his father caught him. A safety plan was implemented restricting Father from living in the home and the case was transferred to Family Based Safety Services. On August 30, 2012, an FBSS caseworker made the initial home visit and found Father at the home in violation of the safety plan. Father was asked to leave and request an extension of his stay in the barracks. On September 12, 2012, Lt. Clark informed the caseworker that another soldier had been taking Father to the home after work. At that point a decision was made to have the parents place B.C.S. at the Child Crisis Center. On September 17, 2012 the child was released to the step-mother under a new safety plan again restricting Father from going to the residence. The couple began to comply with the Department and they were receiving services. On November 13, 2012, a new safety plan was implemented allowing Father back into the home based on the couple's progress with services. On November 27, the child told the caseworker that his parents fought all the time and that his father had cut his step-mother's hand with broken glass. The Department grew concerned that Father and his wife continued to violate the safety plans by putting B.C.S. at risk by arguing and fighting in front of him. On November 29, it filed for emergency protective orders. Following a hearing on December 7, the

---

[1] We are not aware of the date Father and K.S. married. We do know that they resided with B.C.S. and K.S.'s child, J.M., who was removed at the same time as the child the subject of this suit.

Department was appointed temporary managing conservatorship and B.C.S. was placed in foster care in El Paso. Because Father had neither home nor job in Texas, he returned to Massachusetts. This proved to be problematic. Massachusetts is a non-compact state, meaning that Father would have to pay for any services the Department required of him. Had he been able to remain in Texas, the Department would have paid for those services. Eventually, he was able to receive treatment through the Veterans Administration.

Judging from the police records in evidence, a great deal of violence occurred between Father and K.S. The district attorney's office declined to prosecute most of them, noting (1) officers could not tell which spouse was the aggressor; (2) K.S. was intoxicated and they could not ascertain her allegations; and (3) K.S. was determined to be non-credible. On the other hand, there are two distinct incidents involving arrest and prosecution. On December 16, 2012, El Paso police responded to a domestic call and found that K.S. had stabbed Father with a screwdriver and/or scissors, causing significant injury. Apparently, K.S. returned to Massachusetts as well. On July 13, 2014, Father was arrested for aggravated assault and battery, assault and battery with dangerous weapon, violation of an abuse prevention order, and breaking and entering into a motel room where K.S. was staying.

Gloria Augero, a CPS worker, began handling the child's case in April 2013. The Department was interested in relocating B.C.S. to Massachusetts since no family lived in El Paso. Initially, the Department looked at the child's paternal grandmother as a possibility for placement. Because she also lived in Massachusetts, an ICPC[2] investigation was performed. The grandmother's request was denied for the sole reason that she had only a one-bedroom apartment. Upon notice of denial, the Department looked at extended family placement. Upon

---

[2] ICPC refers to the Interstate Compact on the Placement of Children. An out of state placement requires an investigation and is codified at § 162.002(b)(l) of the Texas Family Code.

3

ICPC approval, B.C.S. moved to Massachusetts and began living with the Cunninghams, his paternal great aunt and uncle, in February 2014. Father spoke with the child by telephone daily. B.C.S. told his attorney ad litem that he "cared very much for his father" and that he would have loved to live with him. Father visited the child, but problems soon developed. The Cunninghams required supervised visitation, a restriction with which Father disagreed. Mrs. Cunningham testified that Father became more verbally aggressive toward her. Aguero believed that it was in the best interest of the child to remain with the Cunninghams because he needs permanency and stability in his life. On cross examination, she admitted that the child still had desires to have a relationship with his father, whom he loved very much.

The child's grandmother testified at trial via telephone. She explained that she was allowed to visit with her grandson, but the Cunninghams required that her visits be supervised as well. She very much wanted her grandson to live with her. She did not know whether the Cunninghams would allow her to visit if termination were granted, but she was willing to let them visit the child if he lived with her. She also described the relationships between her son and grandson:

> They had a great relationship. They were great, they were like best friends the two of them.
>
> Q: Okay and what would [Father] do with [B.C.S.] if you know, you know, like in terms of taking him out or something like that?
>
> A: Oh, he took him out. He took him to the movies. He played baseball. He took him to the swimming pool when I was down there. You know, like on the weekends he was very involved with [B.C.S.].

One issue weaves its way throughout the entire reporter's record. The Cunninghams wished to adopt B.C.S., but only upon one condition. They were not willing to keep the child unless Father's rights were terminated. In fact, they intended to return the child rather than deal

4

with potential future litigation with Father. Mrs. Cunningham acknowledged that she and her husband would not be willing to agree to anything less than termination "because it'll end up getting dragged on and on and I don't think it's beneficial for [B.C.S.]." Despite the fact that the boy loves his father very much and asks about him, anything short of termination would be a "deal breaker". She admitted that her husband "has made it very clear to me that that is not a path that he is willing to go down."

Q: Okay. Which would mean you would return the child to the department?

A: I – it's – if it were to me, no, but my husband is very adamant. This can't come between myself and my husband. As much as I love this child, I can't – I don't want to say that."

The child's ad litem specifically opposed terminating the parent-child relationship. He was particularly bothered by the Cunninghams unwillingness to keep the child unless Father's rights were terminated. Counsel speculated about their unwillingness to allow visits between the child and his other family members once Father's rights were terminated. The CASA advocate favored termination.

## PARENTAL TERMINATION

A parent's rights may be involuntarily terminated through proceedings brought under Section 161.001 of the Texas Family Code. *See* TEX.FAM.CODE ANN. § 161.001 (West 2008). Under this provision, the petitioner must (1) establish one or more of the statutory acts or omissions enumerated as grounds for termination, and (2) prove that termination is in the best interest of the child. *See id.* Both elements must be established and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Texas Department of Human Services v. Boyd,* 727 S.W.2d 531, 533 (Tex. 1987).

The natural right of a parent to the care, custody, and control of their children is one of constitutional magnitude. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex. 1985); *see also Santosky v. Kramer,* 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982)(acknowledging that a parent's rights to "the companionship, care, custody, and management" of their children are constitutional interests, "far more precious than any property right"). Not only is a parent's interest in maintaining custody of and raising her children "paramount;" it is quite possibly the oldest fundamental liberty recognized by our courts. *See In the Interest of M.S., E.S., D.S., S.S., and N.S.,* 115 S.W.3d 534, 547 (Tex. 2003)(noting that Texas courts recognize that "a parent's interest in maintaining custody of and raising his or her child is paramount"); *Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000) (in discussing the constitutional stature of parental rights, the United State Supreme Court said, "the interest of parents in the care, custody, and control of their children--is perhaps the oldest of the fundamental liberty interests recognized by this Court"); *see also In re M.S.,* 115 S.W.3d at 549 ("Termination of parental rights is traumatic, permanent, and irrevocable."). Although parental rights are of constitutional magnitude, they are not absolute. *In the Interest of C.H.,* 89 S.W.3d 17, 26 (Tex. 2002)("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

### Burden of Proof

Because of the importance of parental rights, and the severity and permanency of termination, the quantum of proof required in a termination proceeding is elevated from a preponderance of the evidence to clear and convincing evidence. *Santosky,* 455 U.S. at 747, 102 S.Ct. at 1391; *accord Holick,* 685 S.W.2d at 20–21; s*ee In re M.S.,* 115 S.W.3d at 547 and *In the*

*Interest of D.S.P. and H.R.P.,* 210 S.W.3d 776, 778 (Tex.App.--Corpus Christi 2006, no pet.) (cases recognizing that involuntary termination of parental rights is a drastic remedy which divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent.); *see also In the Interest of B.L.D. and B.R.D.,* 113 S.W.3d 340, 353-54 (Tex.2003) (noting that because of the severity and permanency of termination, due process requires the party seeking to terminate parental rights prove the necessary elements by the heightened burden of proof of clear and convincing evidence).

"Clear and convincing evidence" means the measure or degree of proof that "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007 (West 2008); *see In the Interest of J.F.C.,* 96 S.W.3d 256, 263 (Tex. 2002); *see also In the Interest of J.A.J.,* 243 S.W.3d 611, 616 (Tex.2007) (contrasting the standards applied in termination proceedings and the standards applied in modification proceedings); *In the Interest of C.D. and K.D.,* No. 02-10-00070-CV, 2011 WL 1743688, at *4 (Tex.App.--Fort Worth May 5, 2011, no pet.). This intermediate standard falls between the preponderance of evidence standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *State v. Addington,* 588 S.W.2d 569, 570 (Tex. 1979); *In the Interest of D.T.,* 34 S.W.3d 625, 630 (Tex.App.--Fort Worth 2000, pet. denied) (op. on reh'g). Although the proof must be more than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. *Addington,* 588 S.W.2d at 570.

### *Standards of Review*

The Supreme Court has clearly articulated the applicable standards of legal sufficiency review in termination cases. Accordingly, we consider all of the evidence in the light most favorable to the trial court's finding, "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In the Interest of J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005), *quoting In re J.F.C.,* 96 S.W.3d at 266. We give deference to the fact finder's conclusions, indulge every reasonable inference from the evidence in favor of that finding, and presume the fact finder resolved any disputed facts in favor of its findings, so long as a reasonable fact finder could do so. *Id.; In re J.F.C.,* 96 S.W.3d at 266. We disregard any evidence that a reasonable fact finder could have disbelieved, or found to have been incredible, but we do not disregard undisputed facts. *In re J.P.B.,* 180 S.W.3d at 573; *In re J.F.C.,* 96 S.W.3d at 266. A legal sufficiency or no evidence point will only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *See Swinney v. Mosher,* 830 S.W.2d 187, 194 (Tex.App.--Fort Worth 1992, writ denied).

### *Statutory Predicates*

The termination order here was based on TEX.FAM.CODE ANN. § 161.001 (1) (A)(B)(D)(E) and (N), with the court finding that Father had:

● (A) voluntarily left the child alone or in the possession of another not the parent and expressed an intent not to return;

● (B) voluntarily left the child alone or in the possession of another not the parent without expressing an intent to return, without providing for the adequate support of the child, and remained away for a period of at least three months;

8

● (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

● (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

● (N) constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective services or an authorized agency for not less than six months, and:

> (i) the department of authorized agency has made reasonable efforts to return the child to the parent;
>
> (ii) the parent has not regularly visited or maintained significant contact with the child; and
>
> (iii) the parent has demonstrated an inability to provide the child with a safe environment.

Both subsections (D) and (E) require proof of endangerment, which means to expose to loss or injury, or to jeopardize a child's emotional or physical health. *Doyle v. Texas Department of Protective and Regulatory Services,* 16 S.W.3d 390, 394 (Tex.App.--El Paso 2000, pet. denied). While endangerment means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffer injury. *Doyle,* 16 S.W.3d at 394. Subsections (D) and (E) differ in one respect: the source of the physical or emotional endangerment to the child. *See In Interest of B.S.T.,* 977 S.W.2d 481, 484 (Tex.App.--Houston [14th Dist.] 1998, no pet.); *In Interest of S.H.A.,* 728 S.W.2d 73, 83-84 (Tex.App.--Dallas 1987, writ ref'd n.r.e.). Subsection (D) requires a showing that the environment in which the child is placed endangered the child's physical or emotional health. *Doyle,* 16 S.W.3d at 394. Conduct of a parent or another person in the home can create an environment that endangers the physical and emotional well-being of a child as required for termination under Subsection D. *Id.; see In re W.S.,* 899 S.W.2d 772, 776

9

(Tex.App.--Fort Worth 1995, no writ) ("environment" refers to the acceptability of living conditions, as well as a parent's conduct in the home). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under subsection (D). *In re M.R.J.M.,* 280 S.W.3d 494, 502 (Tex.App.--Fort Worth 2009, no pet.). The fact finder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent. *Id.* Thus, subsection (D) addresses the child's surroundings and environment rather than parental misconduct, which is the subject of subsection (E). *Doyle,* 16 S.W.3d at 394; *B.S.T.,* 977 S.W.2d at 484; *S.H.A.,* 728 S.W.2d at 84.

Under subsection (E), the cause of the danger to the child must be the parent's conduct alone, as evidenced not only by the parent's actions but also by the parent's omission or failure to act. *Doyle,* 16 S.W.3d at 395; *B.S.T.,* 977 S.W.2d at 484; *S.H.A.,* 728 S.W.2d at 83-84. The conduct to be examined includes what the parents did both before and after the child was born. *In Interest of D.M.,* 58 S.W.3d 801, 812 (Tex.App.--Fort Worth 2001, no pet.); *Dupree v. Texas Dep't. of Protective and Regulatory Servs.,* 907 S.W.2d 81, 84 (Tex.App.--Dallas 1995, no writ). To be relevant, the conduct does not have to have been directed at the child, nor must actual harm result to the child from the conduct. *Dupree,* 907 S.W.2d at 84; *In Interest of C.D.,* 664 S.W.2d 851, 853 (Tex.App.--Fort Worth 1984, no writ). Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In Interest of K.M.M.,* 993 S.W.2d 225, 228 (Tex.App.--Eastland 1999, no pet.). The specific danger to the child's well-being need not be established as an independent proposition, but may be inferred from parental misconduct. *In*

*Interest of N.K.,* 99 S.W.3d 295, 300 (Tex.App.--Texarkana 2003, no pet.). Evidence of criminal conduct, convictions, and imprisonment and its effect on a parent's life and ability to parent may establish an endangering course of conduct. *In re J.T.G.,* 121 S.W.3d at 133. Imprisonment alone does not constitute an endangering course of conduct but it is a fact properly considered on the endangerment issue. *Boyd,* 727 S.W.2d at 533–34; *In re R.W.,* 129 S.W.3d at 743-44. Routinely subjecting a child to the probability that she will be left alone because her parent is in jail, endangers the child's physical and emotional well-being. *See In the Interest of S.D.,* 980 S.W.2d 758, 763 (Tex.App.--San Antonio 1998, pet. denied). However, "the relationship of the parent and child, as well as efforts to improve or enhance parenting skills, are relevant in determining whether a parent's conduct results in 'endangerment' under section 161.001(1)(E), even where the parent is incarcerated." *In the Interest of D.T.,* 34 S.W.3d 625, 640 (Tex.App.--Fort Worth 2000, pet. denied).

Finally, under subsection N, the Department has the burden to establish that the parent constructively abandoned the child. We are reminded that "[o]nly one predicate finding under Section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

### *Best Interest of the Children*

A determination of best interest necessitates a focus on the child, not the parent. *See In the Interest of R.F.,* 115 S.W.3d 804, 812 (Tex.App.--Dallas 2003, no pet.). However, there is a strong presumption that it is in the child's best interest to preserve the parent-child relationship. *Swate v. Swate,* 72 S.W.3d 763, 767 (Tex.App.--Waco 2002, pet denied). The Texas Supreme Court has enumerated certain factors which should be considered: the child's desires; the child's emotional and physical needs now and in the future; the emotional and physical danger to the

11

child now and in the future; the parenting abilities of the individuals seeking custody; the programs available to assist those individuals to promote the child's best interest; the plans for the child by those individuals or the agency seeking custody; the stability of the home or proposed placement; the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one; and any excuse for the parent's acts or omissions. *Holley v. Adams,* 544 S.W.2d 367, 372 (Tex. 1976) ("the *Holley* factors"). Also, permanence is of paramount importance in considering a child's present and future needs. *Dupree v. Texas Department of Protective & Regulatory Services,* 907 S.W.2d 81, 87 (Tex.App.--Dallas 1995, no pet.).

### ISSUES FOR REVIEW

Father brings two issues for review. In Issue One, he challenges the sufficiency of the evidence to support the findings of a statutory predicate for termination and that termination is in the best interest of the child. In Issue Two, he complains of ineffective assistance of counsel.

With regard to the statutory grounds, we initially note that Father has quite admirably articulated the appropriate burdens of proof and standards of review. He has not, however, challenged the specific grounds for termination. At one point, he argues that termination was inappropriate because at the times described he was not a parent but an "alleged father". We construe this as a mistake because Father was not only a parent, he was the court appointed custodial parent. He then indirectly challenges termination on the basis of abandonment. Finally, he offers this sentence:

> Appellant would demonstrate that he was terminated mainly on the grounds that he was incarcerated, however there was no showing as to how long and for what offense.

12

This is certainly true. But Father offers no challenge to the trial court's findings as to endangerment pursuant to subsections (D) and (E). We must therefore affirm if the Department proved statutory endangerment by clear and convincing evidence. We have recounted the volatile and abusive environment within the child's home. Father engaged in a pattern of domestic violence and failed to remove his son from the violence instigated by K.S. Were our analysis to end here, we would affirm the order of termination. Instead, we turn to best interest of the child.

Here we find ourselves in agreement with Father that the Department failed to prove by clear and convincing evidence that termination was in the best interest of B.C.S. With regard to the child's desires, testimony from multiple witnesses established that B.C.S. wanted to live with his father and wanted to continue a relationship with him. There is an emotional and physical danger to the child due to Father's brain injury, anger management issues, and repeated acts of domestic violence. The child's grandmother described the interaction between her son and grandson which demonstrates a loving relationship. While Mrs. Cunningham felt some verbal aggressiveness directed by Father toward her, no one testified that Father had ever lashed out at his son.

Turning to the plans for the child by those seeking custody, we find two observations appropriate. We know that at the time of trial, Father was incarcerated. We do not know upon what charges he was convicted nor the duration of his sentence. The Department failed to elicit evidence as to the length of time before Father is released. Since he was not available for trial, his mother testified to her willingness to have B.C.S. placed with her and to continue her search for a suitable two-bedroom apartment. Clearly, all parties acknowledge that the only reason for denial of the placement was that she lived in a one-bedroom apartment. While the Cunninghams

13

have certainly provided the child with a safe and stable environment, they are not willing to keep him unless Father's rights are terminated. Indeed, Mrs. Cunningham described that her husband was adamant on the issue. This testimony was noticeably painful for her, and we doubt that she would draw such a line in the sand. But her statement was unequivocal -- this child could not and would not come between her husband and herself. We must also question the couple's willingness to allow the grandmother to visit upon termination of Father's rights, as she would have no legal right to enforce.

Finally, we recognize that Father's acts and omissions may prevent him from providing a safe environment for the child without further therapy. But that does not lead us to conclude that the existing parent-child relationship is not a proper one. This military veteran suffered a traumatic brain injury during service to his country. He was asked to obtain services and the record indicates that he did so. He will likely require additional services for some time as he comes to terms with what the Department termed depression and anger management issues.

We understand that the Department has limited resources available and the unusual facts of this case involve a child who temporarily lived in Texas while his father was stationed here. The Cunninghams provided an expedient and safe resolution, but only at the expense of a father and son who love each other and deserve a chance to maintain their relationship. Because we conclude that the evidence was factually insufficient to support a finding of best interest, we sustain subpart two of Issue One. Because of our resolution of Issue One, we need not address Issue Two. The judgment of the trial court is accordingly reversed and remanded.

July 8, 2015

                                ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.