

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00044-CV

———————————————

In the Interest of G.M. and A.M., Children

---

On Appeal from County Court at Law No. 2
Parker County, Texas
Trial Court No. CIV-22-0085

---

Before Sudderth, C.J.; Wallach and Walker, JJ.
Memorandum Opinion by Justice Wallach

# MEMORANDUM OPINION

## I. Introduction

In a single issue, Appellant Mother appeals the termination of her parental rights to G.M. and A.M., complaining that the evidence is legally and factually insufficient to support the trial court's best-interest finding. Because the evidence is both legally and factually sufficient to support the best-interest finding, we affirm.

## II. Background

On February 1, 2022, the Department of Family and Protective Services (DFPS) received a report from Father's sister alleging Mother and Father's neglectful supervision of six-year-old G.M. and one-year-old A.M. based on drug use. It received an informational report two days later about concerns that the children's home lacked electricity and heat.[1] When Dannika Kaufman, a DFPS investigator, tried to visit the home, Mother and Father told her "to get off the property and not to come back until [she] had the FBI with [her]." DFPS filed a petition for orders allowing it to investigate and obtain access to the children. The trial court granted the petition.

During the investigation, Mother, Father, and A.M. tested positive for methamphetamine, although G.M. did not. Mother was very thin and had a lot of

---

[1]Parker County—the county in which the children lived—had been hit by "a big ice and snowstorm" that essentially shut down the county when DFPS received these reports.

open sores on her face, and Mother and Father's home was dirty, with "piles of garbage" and clutter, and it had no electricity.

DFPS filed an original petition for protection, conservatorship, and termination of parental rights in which it alleged that there was an immediate danger to the children's physical health or safety and requested the children's immediate removal. The trial court granted the removal request and named DFPS as the children's temporary managing conservator.

When DFPS removed the children, G.M.'s back molars were "rotten to the gum," she was "very, very thin" and anxious,[2] and she had a bladder infection.[3] G.M. had never attended school and could not identify colors, numbers, or the alphabet, and Father told Kaufman that although he had told his family that he and Mother were homeschooling G.M., they had not been actually homeschooling her. Kaufman testified that during the removal, G.M. was "happy to go with" DFPS, contrary to Kaufman's experience with most children over the age of one. Kaufman said that

---

[2]The children's maternal grandmother (Grandmother), with whom the children had been living at the time of the trial, testified that after removal, G.M. had been fearful of everything, including doctors and police. G.M. had also worried at Christmas that Santa would not come to see her because Santa did not come at her parents' house.

[3]Grandmother, a former labor-and-delivery nurse with thirty years' medical experience, opined that regular medical care and parental attention could have led to the early detection of G.M.'s bladder and dental issues. Grandmother testified that G.M.'s bladder infection had persisted after a round of antibiotics, and G.M. had a renal sonogram during the week of trial.

most children cry and are afraid when removed from their parents. Kaufman also noted that A.M. was "very spacey" at removal, which was not typical for a child her age.

Although DFPS asked for Mother and Father to identify family members who could take the children, Father told Kaufman that he and Mother had "cut off the rest of their famil[ies] due to hi[s] believing that he was being set up to get his children taken away." Father also told Kaufman that he would prefer for the children to go to foster care than to his relatives. Mother did not offer any relatives for placement.

Before Father's sister reported the family to DFPS, she contacted Grandmother to see if she could take the children. Grandmother then contacted DFPS about taking the children but did not hear back immediately. After a brief stay in foster care, the children were placed with Grandmother and Grandmother's husband (together, the Grandparents) in April 2022. Louis Gonzalez, the Our Community Our Kids (OCOK)[4] caseworker at the time, later told Grandmother that Mother and Father had "vehemently" objected to placement with her and had disparaged her character, stating that she was a "pill popper" and had a history of drug use, which Grandmother said was completely false.

The children's foster parents had enrolled G.M. in first grade in their nearby school based on her age, but around a month later, when Grandmother received the

_____

[4]OCOK is a contractor that performs DFPS's conservatorship case work.

4

placement, she enrolled G.M. in kindergarten to avoid possible hurt feelings if G.M. failed to be promoted to second grade with her peers. Grandmother said that G.M. had learned the alphabet by the time she enrolled her in kindergarten.

The trial court ordered Mother to submit to a psychological or psychiatric evaluation and to drug and alcohol assessments and testing, to participate in counseling and parenting classes, to attend supervised visits with the children, and to comply with her service plan. In addition to the above services, Mother's service plan required her to find and maintain full-time employment or to enroll in a continuing education or job-skills program; to maintain regular contact with DFPS; to maintain clean, appropriate, and safe housing; to refrain from any criminal activity or association with those involved in criminal activities; to complete an intimate-partner-violence assessment and anger management classes; and to address any legal responsibilities. The trial court also ordered Mother to pay $150 per month in child support and $25 per month in medical support and health insurance for the children.

Mother tested positive for methamphetamine in March 2022 and did not take a "nail bed" drug test when the trial court ordered one several months later. Mother took the nail bed test on August 15, over two weeks after the trial court ordered it, and she tested negative for drugs. Vanessa Marquez, the OCOK caseworker who inherited the case from Gonzalez in October 2022, testified at trial that a nail-bed drug test shows drug use going back approximately six months. Based on the August test results, Mother would have stopped using methamphetamine after she tested

5

positive in March. Marquez had "no clue" whether Mother had relapsed since taking the nail bed test because although she had asked Mother by text message to take drug tests in October, November, and December, Mother had never responded. Marquez stated that there is a presumption that a drug test would be positive when a caseworker sends a request for drug testing and the parent does not comply. However, she acknowledged that neither parent responded to any of her text messages.

During cross-examination, Marquez acknowledged that Mother had negative urinalysis drug tests in April, May, June, and July. She nonetheless noted that Mother had done nothing to avoid relapse. For example, although Mother and Father had gone to the substance-abuse assessment, "they got upset and stopped the assessment." They were then referred to another facility but informed DFPS that "they had withdrawn and revoked . . . the release of information," so Marquez never received a report from that facility.

Mother completed her parenting and anger-management classes and a psychological evaluation, but she withdrew herself from the batterer's-intervention-and-prevention program (BIPP). At trial, Marquez stated that Mother and Father had been asked to attend BIPP because "[t]here were concerns that there might have been some domestic violence. And it's also due to the fact that [Mother] isn't able to talk when [Father] is there. He talks over her and, you know, she just follows the lead of

whatever he says." Mother and Father neither completed all of their court-ordered services nor appeared at trial.

Mother's last visit with the children was on July 27, 2022,[5] and on November 2, 2022, Mother and Father sent the trial court a letter stating that they were not going to participate in the permanency hearing the next day because "it's been made very obvious that the court was never going to rule in [their] favor in [their] opinion due to everybody's conduct towards [them]." They further stated, "We're not going to listen to more lies be said about us . . . nor listen to anyone accuse us . . . of just going through the motions and not taking this serious." The trial court admitted the letter into evidence.

Even before Mother and Father sent the letter disengaging from the proceedings, they told Marquez that they did not want her help. They also yelled at her, told her to stay off their property, threatened to call the sheriff, and told her that there would be "consequences if [she] showed up [at] the[ir] house." Marquez testified at trial that Mother and Father would not talk to her when she tried to explain that working the services could help them get their children back. Mother did not ask Marquez for any visits with the children or provide Marquez with verification of employment or housing. Marquez opined that it would be in the children's best

---

[5]Grandmother testified that the children were never upset when the visits ended, and their caseworker testified that A.M. did not have a bond with Mother.

interest to terminate Mother's parental rights because Mother had made—and continued to make—bad choices.

Mother, who was thirty-three years old at the time of the trial, had graduated with honors from high school and had been a varsity cheerleader. According to Grandmother, however, Mother "just becomes whoever she's with." Grandmother testified that Mother had moderate attention deficit disorder but, to her knowledge, no other mental health issues, although Grandmother suspected that Mother might have a mood disorder or might possibly be bipolar. Mother's psychological evaluation was not offered at trial.

Mother became involved with Father around six months before becoming pregnant with G.M. They moved in with Grandmother and her husband during Mother's pregnancy and then continued to live there for the first two years of G.M.'s life.

During the eight years that Mother and Father were together, Mother did not have a steady job but worked occasionally as a dancer at Rick's Cabaret and at Buck's, which were strip clubs. Regarding Mother's employment as a dancer, Father told Grandmother, "I know you don't like it, but the money is just too good." Mother did not work as a dancer when she, Father, and G.M. lived with Grandmother, and while they lived with Grandmother, Mother and Father demonstrated appropriate parenting skills with G.M.

When the family lived with Grandmother, Father worked in construction but, according to Grandmother, he never sought permanent employment so that he could avoid paying child support. Grandmother described Father's "superpower" as "avoiding child support." She stated that G.M. was behind on her immunizations when DFPS removed her because Mother and Father had let G.M.'s Medicaid benefits lapse to avoid paying child support or medical reimbursement.

Father was fifty-one years old, and one of his two adult daughters was Mother's age. He also had a teenaged daughter, M.M. When G.M. was almost three years old, he obtained custody of M.M. and started receiving $1,000 per month in child support from the child's mother. During the eight months that M.M. lived with him, he changed her school four times and then returned her to her mother because "it was very expensive having a child." However, he continued to collect child support from M.M.'s mother because, as he told Grandmother, M.M.'s mother would not take him back to court "and he was going to accept [the child support] as long as he was receiving it."

When Mother and Father moved out of Grandmother's house, Father worked as a strip-club "promoter," distributing discount cards for meals, drinks, or admission. Father would go to businesses like liquor stores or convenience stores to request permission to leave the cards there. G.M. and Mother would wait for him in the car, which concerned Grandmother because those places were not "in the most safe areas," and their vehicle did not have air conditioning, which was a problem in the "a

9

hundred-and-something degree[]" weather in the summer. During that time, Grandmother would offer to keep G.M. because she had changed jobs from the hospital to a work-from-home case-management position. She would take G.M. for a weekend, which would turn into two or three weeks. Grandmother said that she always had to be very careful how she phrased things with Father and that she "could never indicate that he's doing any wrongdoing" because she feared that Father would refuse to allow her access to G.M.

In 2019, Grandmother began to suspect that Mother and Father were using drugs. They severed ties with Grandmother in March 2020, around the time Mother discovered that she was pregnant with A.M. Grandmother had never met A.M. before the DFPS removal, and she noted the "incredibly absent" bond between either parent and A.M. during the first visit she attended.[6]

After the children were removed but before they were placed with the Grandparents, the Grandparents ran into Mother and Father one night at Wal-Mart. Father had been unkempt and behaving erratically that night, and he told Grandmother that he had gotten Mother hooked on methamphetamine so that she would not leave him.

---

[6]Gonzalez had warned Grandmother—who had undergone breast-cancer treatment between the last time that she saw G.M. and the first DFPS visit—that G.M. might not recognize her. Grandmother said that when G.M. saw her, she asked her what had happened to her hair, and she called Grandmother's husband "Pop pop," the nickname she had used for him when she lived with them.

When Grandmother told them during that conversation that A.M. had tested positive for methamphetamine at her removal, Father denied that it was true. Grandmother cautioned Mother, "[W]hen the [S]tate removes your children from you, it is[ ] very, very serious," and she asked Mother why she had let the children suffer and why Mother had not contacted her for help. Grandmother said that at that point, Father told them that he would call Gonzalez and sign the children over to the Grandparents. Grandmother said that Gonzalez was astonished that Father "walked back everything that he said . . . at the adversary [removal] hearing."

According to Grandmother, when DFPS removed the children in February 2022, Father's sister, who had reported Mother and Father to DFPS, told her that Mother and Father had been living in a trailer with no electricity or running water and that the children "were in horrible condition."[7] Grandmother testified that she loved her daughter but that nothing excused Mother's lack of medical care for the children, her drug use, or her failure to work her service plan, and she asked the trial court to terminate the parents' rights so that she and her husband could adopt the children.

Marquez testified that G.M. and A.M. were "doing wonderful" with the Grandparents, that G.M. and A.M. loved them, and that DFPS's goal for the children was for the Grandparents to adopt them. After being placed with the Grandparents,

[7]Father's sister also told Grandmother that Mother and Father stole electricity by stringing an extension cord from another house and that they used a water hose for water.

A.M. began receiving services through Early Childhood Intervention (ECI). Marquez explained that children under the age of three receive ECI when they show certain deficiencies and that A.M. had been found deficient in several areas when she was removed. By the time of the trial, A.M. was on target developmentally to the point that ECI could close her case. Since her placement with Grandmother, G.M. had become on target for her speech.

Robyn Jackson, the court-appointed special advocate, testified that she had a good communication level with Mother and Father by email, phone, and text until September, when Father became very belligerent and began accusing her of being a liar. When she spoke with Mother by phone in September and asked Mother if she was going to do anything to try to get her children back, Mother replied, "Why should I do anything when they're lying about us?" Jackson stated that Mother's tone was very rude. Jackson persisted in trying to explain that DFPS was doing what was required by law, but Mother kept cutting her off, and after the third time, Mother told her, "I'm hanging up now and I do not want to hear from you again." Jackson had sent Mother and Father a text before the trial to see if they were going to appear, and Father told her that they were not going to appear, that "they [had] filed something with the state bar," and that Jackson was a liar.

Jackson opined that it was in the children's best interests to terminate Mother's parental rights because there was no proof that she could provide the children with a

safe, stable environment. She stated that the children had done extremely well in the Grandparents' home and deserved to be adopted by them.

The children's ad litem attorney reported at trial that although Mother and Father had been capable of participating in their services, they had not. And she stated that she had observed a definite disconnect between them and the children that was neither normal nor healthy. In contrast, the children's interaction with the Grandparents was normal, and the children were happy.

At the trial's conclusion, the trial court terminated Mother's parental rights based on findings of endangerment, constructive abandonment, and failure to comply with court orders, together with a finding that termination was in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E), (N), (O), (2). The trial court also terminated Father's parental rights, but Father has not appealed.

### III. Best Interest

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. *Id.* § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

13

Mother challenges the legal and factual sufficiency of the evidence to support the trial court's best-interest finding. To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's finding and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that DFPS proved that the termination of the parent–child relationship would be in the children's

14

best interest. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

Further, although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

(A) the [child's] desires . . . ;

(B) the [child's] emotional and physical needs[,] . . . now and in the future;

(C) the emotional and physical danger to the child now and in the future;

(D) the parental abilities of the individuals seeking custody;

(E) the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F) the plans for the child by these individuals or[, if applicable,] by the agency seeking custody;

15

(G)   the stability of the home or proposed placement;

(H)   the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I)   any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

Mother argues that although she did not complete her service-plan requirements, she completed her parenting and anger-management classes, as well as a court-ordered psychological evaluation. She contends that the psychological evaluation results "did not indicate any type of disorder or other egregious need that would otherwise impair [her] ability to parent[] beyond additional counseling and parenting education." However, the psychological evaluation was not offered or admitted into evidence during the trial.

Mother also directs us to evidence that at some point between March 2022 and August 2022, based on her drug test results, she "got the methamphetamine[] out of

16

her system." She also emphasizes that there was no evidence of any criminal activity by her during the case's pendency. Based on the above, Mother contends that DFPS "has failed to produce sufficient evidence that the [c]hildren are better off having [Mother] completely removed from their lives." To support her argument that DFPS merely showed that the children were in a better environment and not that termination of Mother's parental rights was in their best interests, Mother directs us to the following five cases, among others: *In re J.G.S.*, 574 S.W.3d 101 (Tex. App.—Houston [1st Dist.] 2019, pet. denied); *In re N.L.D.*, 412 S.W.3d 810 (Tex. App.—Texarkana 2013, no pet.); *In re B.C.S.*, 479 S.W.3d 918 (Tex. App.—El Paso 2015, no pet.); *In re R.S.D.*, 446 S.W.3d 816 (Tex. App.—San Antonio 2014, no pet.); and *In re R.S.*, No. 02-18-00127-CV, 2018 WL 4183117 (Tex. App.—Fort Worth Aug. 31, 2018, no pet.) (mem. op.).

DFPS responds that "[t]his is not a case where the children would merely be better off living somewhere else or one in which Mother shouldn't simply have sole managing conservatorship. This is a case where Mother's relationship with the children was not proper before removal and continued to be improper throughout the case up to and including the termination trial itself."

We agree with DFPS and note that each of the cases cited by Mother are inapposite in that each involved some unusual or extenuating circumstances with regard to the parent and the termination-seeking party's failure to show that termination was required.

*J.G.S.* and *N.L.D.* were both private terminations in which the parents testified at trial. In *J.G.S.*, the parent testified telephonically about his efforts to maintain his relationship with his nine-year-old child despite a long-distance separation caused by a military incarceration during his deployment, and the grandparent seeking adoption by private termination presented no evidence to show that the child would be harmed by limited contact with her parent. 574 S.W.3d. at 108, 110, 124–25, 128. The court concluded that there was legally, but not factually, sufficient evidence to support the best-interest finding, reversed the trial court's judgment on the best-interest finding, and remanded the case for additional proceedings on that issue. *Id.* at 129. Unlike the parent in *J.G.S.*, however, Mother had no excuse for failing to appear at trial in person or telephonically, and she opted to stop visiting the children during the case.

In *N.L.D.*, the two-year-old child's relatives initially sought managing conservatorship and then termination of the mother's parental rights after the child was placed with them. 412 S.W.3d at 813–14. The mother testified at the trial. *Id.* at 820. The court held that there was sufficient evidence supporting the jury's finding that the relatives should be appointed sole managing conservators because of the mother's "history of drug use, irresponsibility, frequent moves, and bad judgment" when compared to evidence that removal from the relatives' stable, loving home would be detrimental to the child's health and well-being. *Id.* at 822.

As to the best-interest finding, however, the court concluded that the evidence was factually insufficient because DFPS had investigated the same allegations—drug

18

use, domestic violence, neglect, and an unsafe home environment—but had neither removed the child nor begun a case "because the investigation did not validate the allegations; rather, the investigator found no evidence of drugs [and found] a clean house[] and healthy, well-groomed children." *Id.* at 822–23. Further, the trial court's independently appointed contractor who performed a social study did not recommend termination because the child's sibling remained with the mother, who was pregnant, and "a relationship with [the child's] biological siblings would be meaningful to her life and important to her future development." *Id.* at 821, 823–24. Unlike in *N.L.D.*, the case here began with DFPS's investigation and then removal of the children—one of whom had some teeth rotted to the gumline and the other tested positive for methamphetamine—and no one at trial recommended continued contact between Mother and the children.

The other three cases Mother relies upon—*B.C.S., R.S.D.,* and *R.S.*—arose from DFPS removals but are nonetheless distinguishable as well. In *B.C.S.*, the father suffered a traumatic brain injury during military service, and the injury affected his ability to control his anger and led to his discharge. 479 S.W.3d at 921. After his seven-year-old child was placed with relatives, the father spoke by phone with him daily. *Id.* at 922–23, 928. The relatives were not willing to keep the child without termination of the father's parental rights, *id.* at 923, but multiple witnesses established that the child wanted to live with his father and wanted to continue a relationship with him. *Id.* at 928. The court held the best-interest evidence factually insufficient because

although the child's relatives provided an expedient and safe resolution, they did so "only at the expense of a father and son who love each other and deserve a chance to maintain their relationship." *Id.* In contrast, here, there is no evidence that Mother had bonded with A.M., the record reflects that G.M. was happy to leave with DFPS at the time of removal, and Mother stopped visiting the children during the six months before trial. *See In re C.B.*, No. 02-22-00212-CV, 2022 WL 15076123, at *3 (Tex. App.—Fort Worth Oct. 27, 2022, pet. denied) (mem. op.) (noting that a parent's failure to exercise visitation rights "is probative of the fact that her relationship with the children is not a proper one").

In *R.S.D.*, the mother testified telephonically because she was incarcerated for drug possession and had been since the same month as the child's removal. 446 S.W.3d at 818–19. Because of her incarceration, she had not seen the four-year-old, developmentally delayed child for more than a year at the time of the termination trial. *Id.* at 818, 820–21. Although the child had an aunt in California who was willing to adopt him, no evidence was presented about the aunt or her home. *Id.* at 821. Other than the mother's incarceration, no evidence was offered on whether her relationship with her child was improper, and other than her single admission of cocaine use, there was no other evidence of any excuse for her acts or omissions. *Id.* While incarcerated, the mother finished her parenting and domestic-violence classes, attended Narcotics Anonymous, underwent counseling, and almost completed her

20

GED. *Id.* at 818, 822. Based on that record, the court concluded that DFPS had failed to meet its clear-and-convincing burden on best interest. *Id.* at 822.

In contrast to the facts of *R.S.D.*, at the time of the removal, A.M. tested positive for methamphetamine, some of G.M.'s teeth had rotted, and both children were educationally delayed. The record also reflects that Mother's drug use and prioritizing Father over the children's needs were her only excuses because she did not appear to present any controverting evidence. Further, the evidence at trial showed that Grandmother had provided the children with a stable, happy home in contrast to the cold and dirty one from which the children were removed.

Finally, in *R.S.*, the father testified during the termination trial, and we held that the best-interest evidence was factually insufficient because (1) the foster parents were not opposed to continuing parent–child contact, (2) no one disputed the close bond and love between the child and his father, (3) there was no evidence—despite the father's assaultive behavior—that he had ever harmed the child or had failed to resolve his domestic-violence issue, (4) there was no evidence to contradict the foster parents' concerns about what a father–child separation might do to the child's emotional state, (5) some of the caseworker's testimony regarding the father's employment and source of income was speculative, and (6) many of the records that might have contradicted the best-interest factors weighing in the father's favor were not offered into evidence. *See* 2018 WL 4183117, at *1, *3, *16–17. Here, the record reflects that Mother exposed her children to drugs and neglected their physical and

emotional health until their removal and then neglected their emotional health by failing to visit them during the six months before trial.

Further, the record reflects that during the case, Mother was unable or unwilling to make the changes necessary to obtain the children's return to her; G.M. expressed no desire to return to Mother; and A.M., although too young to verbally express her desires, did not appear bonded to Mother before Mother stopped visiting the children. Both children were bonded with Grandmother and were thriving under her care. From Mother's behavior during the case's pendency, the trial court could infer that Mother's conduct would continue to endanger the children if her rights were not terminated. *See In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g) ("The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent.").

Because Mother opted not to attend the trial, she presented no contrary evidence to show that she would—or could—meet the children's needs; there was no evidence that she had obtained stable housing or employment or that she was willing or able to provide the children with necessary medical care. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to comply with a family service plan support a finding that termination is in the best interest of the child."). She presented no evidence to explain her acts or omissions before and during the case or her plans for

22

the children. *See In re E.B.*, No. 02-22-00205-CV, 2022 WL 17172340, at \*10 (Tex. App.—Fort Worth Nov. 23, 2022, no pet.) (mem. op.) (noting that parent did not explain why she did not appear for trial); *see also Holley*, 544 S.W.2d at 371–72 (stating that the factfinder may consider, among other things, the children's present and future emotional and physical needs, the parental abilities of those seeking custody, their plans for the children, and the stability of the home or proposed placement). The record supports Grandmother's ability to meet the children's emotional and physical needs, as well as her desire to adopt the children and care for them permanently.

Having reviewed the evidence in the light most favorable to the best-interest finding, we conclude that the trial court reasonably could have formed a firm belief or conviction that termination of Mother's parental rights was in the children's best interest because the trial court could have chosen to believe the testimony of Grandmother and the other witnesses. *See Z.N.*, 602 S.W.3d at 545; *J.O.A.*, 283 S.W.3d at 346. Further, having reviewed the entire record and giving due deference to the trial court's finding, we likewise conclude that the evidence is factually sufficient to support the best-interest finding, *see A.B.*, 437 S.W.3d at 500; *H.R.M.*, 209 S.W.3d at 108, in light of the required focus on the children's well-being, safety, and development, *A.C.*, 560 S.W.3d at 631. Accordingly, we overrule Mother's sole issue.

## IV. Conclusion

Having overruled Mother's sole issue, we affirm the trial court's judgment.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered:  May 25, 2023