**Opinion filed September 21, 2023**



# In The

# Eleventh Court of Appeals

_____

## No. 11-23-00056-CV

_____

## IN THE INTEREST OF A.C., A CHILD

**On Appeal from the 326th District Court**
**Taylor County, Texas**
**Trial Court Cause No. 10469-CX**

## M E M O R A N D U M   O P I N I O N

This is an appeal from an order in which the trial court terminated the parental rights of both the father and the mother of A.C. *See* TEX. FAM. CODE ANN. § 161.001 (West 2022). The mother filed a notice of appeal. We affirm.

*Termination Findings and Standards*

The termination of parental rights must be supported by clear and convincing evidence. FAM. §§ 161.001(b), 161.206(a), (a-1). To terminate one's parental rights under Section 161.001, it must be shown by clear and convincing evidence that the parent has committed one of the acts listed in Section 161.001(b)(1)(A)–(U) and that

termination is in the best interest of the child. *Id.* In this case, the trial court found that the mother had committed two of the acts listed in Section 161.001(b)(1)—those found in subsections (D) and (E). The trial court also found that termination of the mother's parental rights would be in the best interest of the child. *See id.* §§ 161.001(b)(2), 161.003(a)(5). In two issues, the mother challenges the legal and factual sufficiency of the evidence supporting these findings.

To determine if the evidence is legally sufficient in a parental termination case, we review all of the evidence in the light most favorable to the finding and determine whether a rational trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). To determine if the evidence is factually sufficient, we give due deference to the finding and determine whether, on the entire record, a factfinder could reasonably form a firm belief or conviction about the truth of the allegations against the parent. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We note that the factfinder is the sole arbiter of the credibility and demeanor of witnesses and the weight to be afforded their testimony. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (citing *In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005)).

With respect to the best interest of a child, no unique set of factors need be proved. *In re C.J.O.*, 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010, pet. denied). But courts may use the non-exhaustive *Holley* factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These include, but are not limited to, (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or

omissions of the parent that may indicate that the existing parent–child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Id.* To support a best interest finding, the Department is not required to prove all of the *Holley* factors; in some circumstances, evidence of the presence of only one factor will suffice. *In re D.M.*, 452 S.W.3d 462, 473 (Tex. App.—San Antonio 2014, no pet.). Additionally, evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *C.J.O.*, 325 S.W.3d at 266.

The absence of evidence of some *Holley* considerations does not preclude the factfinder from reasonably inferring or forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence indicates that the parental relationship and the parent's conduct has endangered the safety of the child. *C.H.*, 89 S.W.3d at 27. This is so because the best interest analysis evaluates the best interest of the child, not the parent. *In re E.C.R.*, 638 S.W.3d 755, 767 (Tex. App.—Amarillo 2021, pet. denied) (citing *In re B.C.S.*, 479 S.W.3d 918, 927 (Tex. App.—El Paso 2015, no pet.)).

In this regard, the factfinder may measure a parent's future conduct by her past conduct and determine whether termination is in the child's best interest. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied); *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011 [Panel Op.], no pet.). The factfinder may infer that a parent's past conduct that endangered the safety and well-being of a child may recur in the future if the child is returned to the possession of the parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Further, the factfinder may infer from a parent's past inability to meet a child's physical and emotional needs an inability or unwillingness to meet the child's needs in the future. *Id.*; *see also In re A.S.*, No. 11-16-00293-CV, 2017 WL 1275614, at *3 (Tex. App.—Eastland Mar. 31, 2017, no pet.) (mem. op.). The

factfinder may also consider a parent's failure to comply with a court-ordered family service plan for reunification with the child in making its best interest determination. *In re E.C.R.*, 402 S.W.3d 239, 249–50 (Tex. 2013); *In re E.C.R.*, 638 S.W.3d at 769 (citing *In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.)).

*Procedural and Factual Background*

The intake for the child in this case stemmed from a police interaction with the mother. On the morning of July 24, 2021, Abilene Police Detective Sterling Riddle received a call for a welfare check at a Greyhound bus stop in Abilene. The bus stop is attached to a 7-Eleven and has some benches under a metal covering. When Detective Riddle arrived, the mother and the child, A.C., were the only people at the bus stop. The mother was standing in the area where the buses come in to refuel with her hands on the ground—in a "four-point stance." Her four-year-old child, A.C., was running around in the covered area. Detective Sterling described the area where the bus stop was located to be a "highly trafficked area" and a "high call area" or "high crime area."

Detective Riddle attempted to communicate with the mother, but she did not acknowledge his presence. The mother was mumbling and yelling, but the detective was unable to understand what exactly she was saying. Detective Riddle observed that the mother was not wearing shoes, and that there were shoes and clothing items spread out under the awning area. The mother's Louisiana identification card was in the property scattered around the bus stop and the child was able to give the detective its name. An ambulance was called for the mother and child protective services (CPS) was called for the child, A.C.

Department of Family and Protective Services (the Department) Investigator Kelly Loza testified that she attempted to speak with the mother at the hospital, but the mother spoke incoherently and her statements did not make sense. Loza later learned that the mother had been removed from the hospital and taken to River Crest

4

due to a mental health breakdown. Loza testified that the mother had been prescribed medication before traveling to Texas with A.C. but had chosen to stop taking that medication, which endangered the well-being of A.C. The child was placed in foster care while the mother was in the hospital.

Following her release from River Crest, the mother participated in an evaluation with licensed psychologist Dr. Scott Brown on September 1, 2021. The mother was diagnosed with "Bipolar Disorder 1" with a recent manic episode; post-traumatic stress disorder; and borderline intellectual function; Dr. Brown also noted that "she had a history of both physical and sexual abuse in her life." The report of Dr. Brown showed scores in the first percentile for math, fifth percentile for spelling, and fourth percentile for reading, reflecting a "very low to extremely low" range of academic skills. Dr. Brown's report included recommendations for the mother to ensure the safety of her son. One recommendation indicated that it was imperative for the mother to "receive consistent and monitored treatment, including medication consultation and counseling support." Dr. Brown testified that if the mother failed to take her prescribed medication consistently, it would increase the mother's chance of having another manic episode like the one which occurred on July 24, 2021.

The initial goal of the Department was reunification. That goal was changed to adoption in June of 2022. A 2INgage caseworker testified that the mother participated in counseling, a psychological evaluation, and visitation with A.C. during the case. The caseworker also testified that she requested the mother attend parenting classes, but that the service provider indicated that they were unable to get in touch with the mother.

The mother testified that, in the past, she has stopped taking medication on her own and has not always followed her doctor's orders with respect to her medication. The mother testified that, in the past, she has used heroin, marihuana, and taken "street drugs, pills," but that she had never used cocaine. Despite this

assertion, a hair follicle test was admitted into evidence which showed that the mother tested positive for cocaine and oxycodone on October 20, 2022, just three months prior to the termination hearing. The mother admitted to taking oxycodone. She explained that she was not feeling well, so she went to a friend's house for the oxycodone; explaining "I don't know if that [cocaine] was in it." Despite this admission, the mother later maintained she did not know how she tested positive for cocaine.

Visitation between the mother and A.C. during the case included virtual visits, supervised in-person visits, and one unsupervised in-person visit. A 2INgage caseworker testified that the mother attended the majority of the visits but missed some visits "based off of being at work or . . . [for] different reasons." During the virtual visits, A.C. was sometimes quiet, eating a snack during the visits and other times, hyper, jumping and moving around. One of A.C.'s foster parents also testified that A.C. had to leave the placement because the child would become angry, self-harming, and destructive following visits—or missed visits—with the mother. A.C.'s caseworker described to the trial court how A.C. "looks for rewards for everything" and that the mother will give in to these requests and "doesn't know how to discipline appropriately."

Additional evidence was presented about the mother's interactions with A.C. and her inability to parentally manage his behavior. The mother testified that part of the reason why she was in Texas in the first place was because she was depressed and "need[ed] to get away." She indicated that her son, A.C., was aggravating her and he did not want to listen to her. The mother also called the 2INgage supervisor during her unsupervised in-person visit because A.C. was not listening to her. The supervisor testified that the mother's response was to put "a pillow or blanket over her head" to try to block him—or his noise—out. The supervisor said the mother

6

did not ask for assistance or advice, but instead told the supervisor what was happening and how she was feeling.

The unsupervised in-person visit occurred in May of 2022. Prior to the visit, A.C.'s foster parent at the time testified that she gave the mother A.C.'s allergy and asthma medication, as well as a medication log with the method to administer the medication and the proper dosage. The foster parent also had requested that the mother document the medication on the log, as it was required. The mother did not document the administration of any medication in the log, and A.C. told the foster parent that the child had received a "full cup" of one of his medications. The foster parent checked the medication bottle and testified that the amount missing was more than it should have been after the visit. A.C. was supposed to receive a 2.5 milliliter dose and the foster parent estimated that a "full cup" would be approximately 22 to 24 milliliters. The 2INgage supervisor at the time testified that the mother indicated that she only gave A.C. a one-half cup of the medication on two days, not a full cup. The supervisor indicated that she was not sure that the mother ever understood the issue regarding the incorrect dosage of medication given. The child was diagnosed with ADHD and oppositional defiant disorder with a possible diagnosis of a dysregulation mood disorder. He is on medication for ADHD and mood regulation, and his caseworker testified that it is important for this medication to be given to him accurately.

The 2INgage supervisor testified that an ICPC (Interstate Compact Placement Request) home study was requested for the mother. Following the removal of A.C. in July 2021, the mother stayed in Abilene for two months before she returned to Louisiana. The ICPC request was denied "based on policy placement request criteria, which includes information received from our criminal background check." The mother testified that she had prior criminal convictions for "crime against nature," prostitution, and theft, but that she had not had any charges at all since A.C.

was born. Despite the ICPC request denial, A.C.'s caseworker visited the mother's apartment in Louisiana. The apartment has two bedrooms and two bathrooms, and the caseworker testified it was a safe and appropriate space for the child. The mother was employed sporadically throughout the case, but the caseworker agreed that the mother had a legal source of income.

The caseworker testified that the Department had a home approved for the adoption of A.C. and that she believed that the termination of both parents' rights[1] was in the best interest of the child. The trial court terminated the mother's rights under subsections (D) and (E) of Section 161.001(b) of the Texas Family Code, finding termination to be in the best interest of the child. This appeal followed.

*Analysis*

*Endangering Conduct*

In the mother's first issue, she challenges the findings made by the trial court under subsections 161.001(b)(1)(D) and (E). We must address a parent's challenge to a trial court's findings under subsection (D) or (E). *See In re N.G.*, 577 S.W.3d 230, 234–35 (Tex. 2019) (addressing due process and due course of law with respect to appellate review of grounds (D) and (E) and holding that an appellate court must provide a detailed analysis if affirming the termination on either of these grounds).

Under subsection (D), termination is permitted when the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." FAM. § 161.001(b)(1)(D). The relevant time frame for evaluating this ground is before the removal of the child or a monitored return, as these conditions must be experienced by the child, not anticipated. *See In re J.W.*, 645 S.W.3d 726, 749 (Tex.

---

[1]The father signed an Affidavit of Relinquishment on December 31, 2022, and the affidavit was admitted as an exhibit. The trial court terminated the father's rights in accordance with the request, and the father has not submitted an appeal.

2022).  "The suitability of a child's living conditions and the conduct of parents or others in the home are relevant to a Subsection (D) inquiry."  *Id.* (citing *In re R.S.-T.*, 522 S.W.3d 92, 108–09 (Tex. App.—San Antonio 2017, no pet.)).

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act.  *In re D.O.*, 338 S.W.3d 29, 34 (Tex. App.—Eastland 2011, no pet.).  Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.  *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied); *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.).  With respect to the sufficiency of the evidence to support a finding under subsection (E), "endangering conduct is not limited to actions directed towards the child."  *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)).  Nor does the child actually have to suffer an injury.  *Id.*  The endangering conduct may include the parent's actions before the child's birth and may relate to the parent's actions while the parent had custody of other children.  *Id.*; *In re S.T.*, No. 11-19-00363-CV, 2020 WL 2610393, at *3–4 (Tex. App.—Eastland May 18, 2020, pet. denied) (mem. op.) (upholding finding under subsection (E) based upon parent's conduct with other children).  Additionally, domestic violence may constitute evidence of endangerment.  *C.J.O.*, 325 S.W.3d at 265.

Support for a finding under either subsection (D) or (E) is enough to uphold the termination of the parental rights of the mother.  The evidence presented at trial clearly supports the finding under subsection (E).  The record shows that the mother was inconsistent in taking her own medication, leading to a manic episode which left the child unattended at an outdoor bus station in a high traffic, high crime area at only four years old.  The mother testified that she consistently would disregard

medical instructions for her medication. The psychologist who evaluated the mother testified that not taking her medication consistently would increase the chance of another manic episode—or an episode where she was not in control. The mother was also unable to properly administer allergy medication to the child during the unsupervised in-person visit, and the caseworker testified that, with the child's new medications, proper administration was vital. The record also shows that the mother was unable to manage the child's behavior—once feeling so overwhelmed she left her home and traveled by bus to another state because she was stressed and frustrated, and another time, feeling so overwhelmed she covered her head with a blanket to block out his "noise" and called the case supervisor to complain. Further, the mother was unable to show she would be able to discipline the child, giving in to his outbursts to stop the negative behavior. Finally, the mother tested positive for cocaine and oxycodone in October 2022, admitting that she sought out the oxycodone from a friend because she was not feeling well.

Based upon the evidence presented at trial regarding conduct relevant to the care of A.C., the trial court could have reasonably found by clear and convincing evidence that the mother engaged in a course of conduct that endangered A.C. *See J.W.*, 645 S.W.3d at 749. Therefore, we hold that the evidence is legally and factually sufficient to uphold the trial court's finding under subsection (E). Accordingly, we overrule the mother's first issue. Because only one statutory ground is necessary to support termination and because we have upheld the trial court's finding as to subsection (E), we need not address the arguments as to subsection (D). *See* FAM. § 161.001(b)(1); *N.G.*, 577 S.W.3d at 234–35; *see also* TEX. R. APP. P. 47.1.

*Best Interest*

In the mother's second issue, she challenges the sufficiency of the evidence to support the trial court's finding that termination of her parental rights would be in the best interest of A.C.

With respect to A.C.'s best interest, the evidence set forth above shows that the mother was not able to meet the needs of A.C. and was not able to take care of herself in a manner that would ensure A.C.'s safety. Clear and convincing evidence showed that placing A.C. in a home with the mother would create a risk of danger to his safety. Testimony showed that the mother was not able to manage or handle A.C.'s behavior, was not able to properly administer prescribed medicine to A.C., was unable to consistently take her own prescribed medication, and was using controlled substances during A.C.'s removal. At the time of the termination hearing, the Department had identified an approved placement option for A.C., should termination be granted. Furthermore, the case manager testified that it would be in A.C.'s best interest to terminate the parental rights of the mother.

The trial court, as the factfinder, is the sole judge of the witnesses' credibility. *A.B.*, 437 S.W.3d at 503. In light of the deference to be given the trial court in this regard, the evidence presented at trial, and the *Holley* factors, we conclude that the trial court could reasonably have formed a firm belief or conviction that termination of the mother's parental rights would be in A.C.'s best interest. *See Holley*, 544 S.W.2d at 371–72. Upon considering the record as it relates to the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of those involved, the plans for the child by the Department, the stability of the home or proposed placement, the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent, we hold that the evidence is legally and factually sufficient to support the

11

trial court's finding that termination of the mother's parental rights is in the best interest of A.C. *See id.* We defer to the trial court's findings as to the child's best interest, *see C.H.*, 89 S.W.3d at 27, and we cannot hold in this case that the trial court's findings as to best interest are not supported by clear and convincing evidence. Accordingly, we overrule the mother's second issue.

## *This Court's Ruling*

We affirm the trial court's order of termination.


W. BRUCE WILLIAMS

JUSTICE


September 21, 2023

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.