

# NUMBER 13-25-00643-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF K.L.G., K.L.G., K.A.R.G., AND K.L.G., CHILDREN

## ON APPEAL FROM THE 377TH DISTRICT COURT
## OF VICTORIA COUNTY, TEXAS

## MEMORANDUM OPINION

### Before Chief Justice Tijerina, and Justices West and Cron
### Memorandum Opinion by Justice Cron

Appellant G.G. (Father) appeals from a judgment terminating his parental rights to his children, K.L.G.-1, K.L.G.-2, K.A.R.G., and K.L.G.-3 (the children).[1] Father requests that this Court modify the judgment by deleting the Subsection (D) and (E) findings because he argues that the evidence was legally and factually insufficient to support them. *See* TEX. FAM. CODE §§ 161.001(b)(1)(D) (endangering conditions), (E)

---

[1] We refer to the parties and children by their initials in accordance with the rules of appellate procedure. TEX. R. APP. P. 9.8(b)(2).

(endangering conduct). Father does not challenge the trial court's Subsection (N) or best-interest findings. *See id.* §§ 161.001(b)(1)(N), (b)(2). We affirm.

## I. BACKGROUND

### A. Pre-Trial

Appellee, the Department of Family and Protective Services (the Department), filed a petition seeking to terminate Father's parental rights to the children.[2] The petition was accompanied by affidavits in support of removal alleging, among other things, that on "January 18, 2024, the Department received a report that [K.L.G.-3], age two years, was taken to DeTar Hospital North. The report states that there are indications that [K.L.G.-3] has been the victim of serious physical abuse."[3] The trial court awarded the Department temporary managing conservatorship of the children.

### B. Bench Trial[4]

The case proceeded to a bench trial on July 15, 2025. The Department initially called one witness, Hailey Valenzuela, a Belong[5] permanency specialist. After her brief testimony, the Department requested the trial court to suspend and reset the trial, which it did. On October 24, 2025, the trial proceedings resumed, and the following evidence

---

[2] Although the Department also initially sought to terminate B.C.'s (the children's mother) parental rights, the record reflects that, despite the alarming reason the Department became involved, an agreement was later reached with her in which her parental rights were not terminated, which was approved by the trial court. Therefore, she is not a party to this appeal.

[3] Additionally, a third affidavit by Department investigator, Curtis Bolden, concerned the "condition of [K.L.G.-3]."

[4] We do not recite the witnesses in the order in which they testified, nor do we recite B.C.'s brief testimony, which related to the agreement she reached with the Department.

[5] *In. re J.M.B.*, No. 04-24-00522-CV, 2025 WL 782699, at *2 n.2 (Tex. App.—San Antonio Mar. 12, 2025, no pet.) (mem. op.) (noting that "[S]JRC Texas Belong is a contractor on behalf of the Department"). Additionally, we observe that when Valenzuela testified on October 24, 2025 (i.e., when the proceedings resumed) she stated her position was "a permanency specialist with SJRC Texas, BELONG."

was adduced.

On direct examination, Detective Jeremiah Cantu with the Victoria Police Department testified regarding the January 18, 2024 incident. He explained that he was given information that there were signs of "shaken-baby syndrome." K.L.G.-3 had "multiple bruises on his face, back, legs, and arms" and "head lice and [an] extremely soiled diaper." At the DeTar North hospital where Detective Cantu responded, B.C. explained to him that she received a call from Orlando Licerio,[6] that K.L.G.-3 was "throwing himself back; he doesn't know what happened; and whenever EMS got there, he wasn't breathing."

When Detective Cantu observed K.L.G.-3, he "appeared . . . lethargic, wasn't really moving, just kind of—you know, just there. He did have bruises that were on his face, under his eyes (indicating)." He also observed bruises "along his legs and his arms." When capturing photos, Detective Cantu also noticed a cut on K.L.G.-3's foot. At the hospital, Detective Cantu also spoke to Licerio who described overseeing the children while B.C. went to work. Licerio reported that everything was fine until he checked on them "closer to 1:00 o'clock" and noticed K.L.G.-3 "wasn't responsive and didn't appear to be breathing and that's when EMS was contacted." Two photographs admitted in the record depict bruising on K.L.G.-3's face and body.

Detective Cantu testified that based on his experience, K.L.G.-3's injuries showed signs of child abuse, and he believed most of the injuries were inflicted by hand. He also believed that the majority of the bruises appeared "historical," as opposed to recent.

---

[6] We note that Detective Cantu testified that Licerio and B.C. lived together. Additionally, we observe that Valenzuela responded "Yes" when asked, "And do you believe that it was [B.C.'s] boyfriend at the time that—Mr. Orlando Licerio that caused all of those injuries to the youngest child in this suit?"

During his investigation, he discovered that K.L.G.-3 had a previous child abuse case, but he did not go into details of that case, stating, "There's already convictions for that." Detective Cantu also observed that B.C. was the "common denominator" between the previous case and the current one as two separate boyfriends were involved. Additionally, he obtained a common response from friends and family that the children were not taken care of, and their discipline was "more on the lines of abuse" because they were struck with "belts" and "on the face to the point to where bruises were being left." Additionally, Detective Cantu testified that, after the forensic interviews of the other three children, he concluded there was probable cause to arrest B.C and Licerio for injury to a child with serious bodily injuries. To Detective Cantu's understanding, both "pled guilty to [these charges] in criminal court[.]"

On cross examination, Detective Cantu testified that he had no indication that Father was involved in the abuse from the January 18, 2024 incident or the previous case of abuse involving K.L.G.-3. On re-direct examination, Detective Cantu explained he spoke to Father during his investigation in February. When asked what Father told him, Detective Cantu testified as follows:

[Detective Cantu]: When I spoke to him at his residence at Mockingbird Lane Apartments, I notated that, . . . [Father] had suffered from serious head trauma due to being in a vehicle accident. You know, at the time while speaking with him, his statements appeared to be inconsistent, which, you know, could be due to his injury because, to my understanding, it was a severe brain injury.

At the beginning of my conversation with him, I was shown—or [Father] showed me on his iPad, which displayed a conversation between him and [Licerio]. [Father] was upset and had texted a lengthy message belittling him, calling him a child abuser and offensive

4

slurs. So that was him speaking to [Licerio].

. . . .

[Father] proceeds to talk about that, you know, he knows about [K.L.G.-3's] incident; and he stated that [Licerio] had been abusing the kids for a long time and that [B.C.] has been letting it slide. [Father] stated that he pressed charges against [B.C.] for violating their child custody court orders the year prior, which was 2023.

. . . .

I asked [Father] how has [Licerio] been abusing the kids, to which he stated the two oldest boys, [K.L.G.-1] and [K.L.G.-2], have told him that [Licerio] hits them with a belt on their legs, giving them bruises. [Father] advised that [K.L.G.-2] had been burned with a cigarette on his chest. [Father] stated that [B.C.] and [Licerio] put them in a room for four hours with no food, drinks, water, or letting them use the restroom. [Father] stated he was advised of this information last year in 2023[,] and reported this information to CPS.

I asked [Father] if the children mentioned any abuse towards [K.L.G.-3], to which he stated, "Yes. They all got hit." When asked about [K.L.G.-3] in particular, [Father] stated that he was advised that they wouldn't put him on his bed. He would get hit and stated that he would be surprised if [K.L.G.-3] got fed.

[Father] stated that a former neighbor once made a plate of food for all of the children; and [Licerio] grabbed the plate, threw it outside, stating that, "Y'all don't need to eat."

When asked if [K.L.G.-1] and [K.L.G.-2] ever saw [Licerio] hitting [K.L.G.-3], he stated that . . . they saw everything because everything happened in front of all of the children.

. . . .

I asked [Father], whenever he was with [B.C.], did he

5

> ever see her hit [K.L.G.-3], to which he stated "no." He stated that when they were together, [B.C.] tended to [K.L.G.-3]; but whenever they split apart, she didn't care.

Next, on direct examination, Valenzuela testified that she was assigned the case in January or February of 2024. As part of her duties, she set up services for Father, which included having him complete parenting classes, either in person or online, attend individual counseling and a psychological, and gain stable housing. As to housing, at a minimum, she wanted Father to have a plan for where he was going to be living given that, at the time, he was in a hospital bed in his biological mother's living room and that location did not have room for the children. Additionally, Valenzuela explained that Father had mentioned a house downtown that his adoptive mother had left him, but that house was not taken care of, and it lacked running water and electricity.

Valenzuela testified that Father left his biological mother's house around "summertime" at a time he could live on his own after "a couple of domestic incidences." He then lived in the previously mentioned house downtown for a couple of months, but Valenzuela believed the house was condemned, so Father left. After that, Father was homeless for about four to six months and then he was arrested in November of 2024, before he found another place to stay.

According to Valenzuela, apart from one visit and offering transportation, Father never attended any other visits with the children. Valenzuela testified that ultimately Father did not complete any services. She also testified that the children "have stated that they wish to not see or speak with [Father]." Valenzuela believed the children would have "emotional" harm if Father remained in their lives given that they lack a bond with him.

6

With regards to Father's "criminal case," Valenzuela testified that it is a "safety concern in itself." Further, she stated that "[Father] knew about the abuse and I personally had never seen a report from CPS[,] but he had also told me that he reported it but in looking back, I never saw any report." Valenzuela believed that termination of Father's parental rights would be in the best interest of the children.

On cross-examination, Valenzuela agreed that for a period of time Father was unable to earn money to provide for his own housing and pay for a vehicle to get to and from his services or visits because of injuries he sustained in a car accident about a month prior to the children's removal. But, according to Valenzuela, Father's biological mother attempted to take him to his services. And, the Department offered to take him to visitations and offered phone calls, but Father never took these opportunities. Valenzuela acknowledged that his injuries required him to undergo several surgeries, including a brain surgery in September of 2024. She also agreed that Father was not living with B.C. when the January 18, 2024 incident occurred, and she believed Licerio caused the injuries to K.L.G.-3.

When asked if Father knowingly allowed the children to remain in conditions or surroundings that endangered their physical and emotional well-being at the beginning of this case, Valenzuela responded, "Yes." Additionally, when asked if Father engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical and emotional well-being of the children, she responded, "I would say 'yes.'"

On direct examination, Susan White testified that she has been involved with the

7

case since February of 2024 and had a relationship with all of the children.[7] White recommended that it would be in the best interest of the children that Father's parental rights be terminated given that he had not been involved nor attempted to be involved with them. She also believed Father posed an emotional danger to the children. White explained that even visits with Father would emotionally "take a toll" on the children, as he missed opportunities in the beginning when the older two children were asking to talk to him. She denied ever seeing Father in a wheelchair or a walker, including the beginning of the case but acknowledged that he had his "skull cap removed and there was brain damage." She also acknowledged that it was possible that his injuries affected his ability to see his children.

Lastly, on direct examination, Father agreed that a month prior to the children's removal, on December 10, 2023, he was in a significant car accident which required him to undergo multiple surgeries with the last one occurring on September 3, 2024.[8] He agreed he was in a wheelchair and unable to drive or work during the first part of the case. He also testified to using a walker for some period of time. However, Father also explained that although it hurt to walk, he "helped [himself with] how to walk. [He] threw [his] wheelchair away, and [he] kept [his] walker in the backyard of [his] house." Additionally, Father admitted he was asked to complete services, but he did not. And he agreed that he struggled to complete services because he was in a wheelchair and could not drive.

---

[7] Susan White did not identify her role in the case during her testimony. However, we observe that both parties have identified her in their respective briefs, as the "CASA," i.e., the Court-Appointed Special Advocate.

[8] Father was incarcerated at the time of trial.

Additionally, Father testified that he was arrested on "November 13th." And when asked for what, he responded, "First, the reason why I got arrested at Speedy Stop is because there was a possession of less than a gram." He agreed that since then he has been incarcerated and may see parole in two to three years. Father also agreed he is in prison because he pleaded guilty to a criminal offense but he "forgot the name of it."

He testified that he loves his children and is asking that his parental rights not be terminated. Further, Father testified that "nobody wanted to help [him] do parenting classes out there in the free world" so he is currently taking the classes on a tablet in prison. He also said that from "behind four walls" he is trying to fix a house that the children's "grandma gave them." Father admitted that he had not been in the children's lives for "the past nine years because [he has] been incarcerated," but "[t]his is [his] last time." When asked whether there was anything else he wanted to tell the trial court, he stated, among other things, that he is "done doing drugs," and "y'all wanted me to force it to trial, 25 to life, because I've been here twice and this is my third time."

On cross examination, he admitted that solicitation of a minor sounds familiar for what he is prison for but denied that it was true. A judgment of conviction was admitted into evidence which reflected that Father was convicted for "Solicitation [o]f [a] Minor." He testified that he thought the minor was "[o]ld enough." Father also admitted that if you add his current five-year term of imprisonment along with the period of time in which he was primarily absent from his children's lives for nine years, then it would equate to a total of fourteen years that he would not be in their lives. During this prolonged absence, Father admitted to using cocaine, marijuana, and alcohol. Additionally, Father admitted he only visited the children once "because nobody wanted to take him to Cuero." He also

9

explained that he "was trying to offer family and friends gas money to do it" but either they had to work or would not do it. As far as financial support for the children, Father admitted he had not provided any since his car accident. According to Father, however, he was trying to get his disability, so he could pay for child support.

Father first denied knowing Licerio but then admitted that he knows him and, is a "[l]ittle pissed off at him." When asked why he was upset, Father stated, "Because the same thing that he tried—or that he did to his daughters and his daughters' mom is the same way I'm upset because of what the boys showed me when I ate lunch with them." Father agreed that lunch occurred in 2023. He admitted that he knew Licerio was not a good person to have around his children. Father also testified that he observed "cigarette burns" and "bruises on their legs." But he stated when the boys showed him their scars, he "called CPS." He admitted, however, that for the best part of a year, he allowed his children to be in a harmful situation with Licerio "because they was with the mom. And I talked to her mom and she told me, 'Don't do nothing. Just let her be with the kids,' and then when all this happened, we all got mad at her."

On further cross examination, Father admitted that when K.L.G.-3 was born in 2021 he was incarcerated, and he got out when K.L.G.-3 was one. However, he subsequently turned himself back in after running away from a halfway house. So, in total before his accident, he had seen K.L.G.-3 approximately "a few times." On redirect examination, Father agreed that B.C. chose to have Licerio live in the home with the children, not him.

## C.    Final Order

The trial court signed an order terminating Father's parental rights based on

Subsections (D), (E), (N), and the best interest of the children. *See id.* §§ 161.001(b)(1)(D), (E), (N), (b)(2). This accelerated appeal followed. *See id.* § 109.002(a-1); TEX. R. APP. P. 28.4.

## II.    SUFFICIENCY

By two issues, which we address together, Father argues there is legally and factually insufficient evidence supporting termination of his parental rights under Subsection (D), as the Department failed to show he knew about the abuse and he reported it when he did, and under Subsection (E), as his previous imprisonment is only a factor for consideration, and the evidence presented showed he did not physically abuse the children given he was imprisoned or recovering from serious injuries. *See* TEX. FAM. CODE §§ 161.001(b)(1)(D) & (E); *In re T.R.*, No. 01-25-00924-CV, 2026 WL 958570 at *9 (Tex. App.—Houston [1st Dist.] April 9, 2026, no pet. h.) ("Because evidence concerning termination under subsections (D) and (E) is interrelated, we may consolidate our examination of the evidence for both grounds." (citation modified)).

## A.    Standard of Review and Applicable Law

"A parent's fundamental right to the care, custody, and control of his child is of constitutional magnitude." *In re J.W.*, 645 S.W.3d 726, 740 (Tex. 2022). "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Before it can involuntarily terminate parental rights, a trier of fact must find by clear and convincing evidence: (1) that a parent's act or omission satisfies a statutory ground for termination found in § 161.001(b)(1) of the Family Code; and (2) that termination is in the child's best interest. *See* TEX. FAM. CODE §§ 161.001(b)(1), (2); *In re*

11

*J.P.B.*, 180 S.W.3d 570, 572 (Tex. 2005) (per curiam). Clear and convincing evidence means "the degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

"This 'high evidentiary burden' requires a 'heightened standard of review' on appeal." *In re J.F.-G.*, 627 S.W.3d 304, 311 (Tex. 2021) (citing *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam)). The distinction between legal and factual sufficiency is the extent to which disputed evidence contrary to a finding may be considered. *See In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). When conducting a legal-sufficiency review, a "reviewing court cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved disputed facts in favor of the finding." *Id*. at 630–31. Therefore, "[e]vidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631.

On the other hand, factual sufficiency "requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* We must consider "whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding" in a factual-sufficiency review. *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*.

We defer to the trier of fact's determinations on the credibility of the witnesses "so long as those determinations are not themselves unreasonable." *In re J.P.B.,* 180 S.W.3d

12

at 573; *see In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam); *see also In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("A standard that focuses on whether a reasonable jury could form a firm conviction or belief retains the deference an appellate court must have for the factfinder's role."). "In a bench trial, the trial court acts as the fact-finder and is the sole judge of witness credibility." *In re A.M.*, 418 S.W.3d 830, 841 (Tex. App.—Dallas 2013, no pet.) (citation modified).

## B.    Endangerment Predicate Grounds

When a parent challenges the sufficiency of the evidence to support endangerment findings under Subsections (D) or (E), as Father does here, due process requires an appellate court to address those findings to ensure a meaningful appeal because of the collateral consequences of a finding under those subsections. *See In re N.G.*, 577 S.W.3d at 237; TEX. FAM. CODE § 161.001(b)(1)(M). Subsection (D) allows termination when the evidence proves by clear and convincing evidence that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." *See* TEX. FAM. CODE § 161.001(b)(1)(D). Subsection (E) allows termination if the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *See id.* § 161.001(b)(1)(E).

"[S]ubsection (D) addresses the *child's surroundings and environment rather than parental misconduct*, which is the subject of subsection (E) . . . ." *In re A.L.H.*, 624 S.W.3d 47, 56 (Tex. App.—El Paso 2021, no pet.) (quoting *In re B.C.S.*, 479 S.W.3d 918, 926 (Tex. App.—El Paso 2015, no pet.)). Subsection (D) allows for termination based on only

a single act or omission. *In re N.N.J.*, No. 13-25-00017-CV, 2025 WL 1700687, at *3 (Tex. App.—Corpus Christi–Edinburg June 18, 2025, no pet.) (mem. op.).

Subsection (E) requires evidence that the endangerment was the result of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Under Subsection (E), termination must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.*; *see C. R. F. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-25-00750-CV, 2026 WL 844380, at *7 (Tex. App.—Austin Mar. 27, 2026, no pet. h.) (mem. op.). Relevant evidence in determining whether a parent engaged in a course of endangering conduct includes conduct that occurred before and after the child's birth, in the child's presence and outside the child's presence, and before and after removal by the Department. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). Further, endangerment under subsection (E) "does not require [the parent's conduct] to directly harm the child." *In re N.L.S.*, 715 S.W.3d 760, 764 (Tex. 2025) (citing *In re R.R.A.*, 687 S.W.3d 269, 278 (Tex. 2024)). Instead, the proper inquiry is whether there is evidence that the parent "exhibited a pattern of behavior presenting a substantial risk of harm" to the child. *Id.* "'Endanger' in this context means to 'expose to loss or injury; to jeopardize.'" *Id.* (analyzing § 161.001(b)(1)(E)); *see In re M.C.*, 917 S.W.2d 268, 269–70 (Tex. 1996) (per curiam) (defining "endanger" as "to expose to loss or injury; to jeopardize" in analyzing Subsections (D) and (E)).

## C.     Analysis

Viewed in the light most favorable to the verdict, the trial court heard testimony from multiple witnesses, including Father himself, that while he was not directly involved

in the January 18, 2024 incident that led to the children's removal, he was nevertheless aware that they endured physical abuse from Licerio for a "long time," yet he continued to allow them to remain in the home where Licerio lived. *See In re C.N.L.*, No. 13-23-00591-CV, 2024 WL 1787893, at *5 (Tex. App.—Corpus Christi–Edinburg Apr. 25, 2024, no pet.) (mem. op.) ("The children's physical or emotional well-being is endangered when the parent fails to remove them from a home in which abusive or violent conduct is occurring."); *In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *11 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.) ("[E]vidence that a parent does not remove her children from, or allows them to remain in, a home where there is violent conduct supports termination of parental rights." (citation modified)). That abuse consisted of K.L.G.-1 and K.L.G.-2 being hit "with a belt on their legs", K.L.G.-2's chest being burned with a cigarette, and "all [of the children being] hit." *See In re B.E.T.*, No. 06-14-00069-CV, 2015 WL 495303, at *5 (Tex. App.—Texarkana Feb. 5, 2015, no pet.) (mem. op.) ("[A]busive or violent conduct by a parent or other resident of a child's home can produce an environment that endangers the physical or emotional well-being of the child." (citation modified)). Additionally, as Father conveyed to Detective Cantu, the abuse consisted of B.C. and Licerio putting the children in a room for four hours with no food, drinks, water, or letting them use the restroom. *See In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *11, 16 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.) (overruling parent's challenge to subsection (D) and (E) after reasoning, among other things, that parent disciplined two of her children, prior to one's death, by making them "'get down in [a] push-up position for like an hour or until they got weak' due to muscle failure"). The trial court also was entitled to disbelieve Father's testimony, that he had

made a report to the Department about the abuse, in light of Valenzuela's testimony that she "never saw any report." *See In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (providing deference to the decisions of the fact finder that had "full opportunity to observe witness testimony first-hand" and was "the sole arbiter when assessing credibility and demeanor of witnesses"). Additionally, Detective Cantu testified that Father told him that K.L.G.-1 and K.L.G.-2 "saw everything" when Father was asked if they saw Licerio hitting K.L.G.-3. *See In re K.S.*, No. 02-14-00073-CV, 2014 WL 3867529, at *8–10 (Tex. App.—Fort Worth Aug. 7, 2014, no pet.) (mem. op.) (evidence sufficient to support termination under Subsections (D) and (E) where children witnessed violence in the home). And even if Father was not aware of the most recent incident of physical abuse against K.L.G.-3, Father was aware that K.L.G.-3 was not safe in B.C.'s care given he suffered abuse from a different boyfriend of B.C.'s in which "convictions" already existed.

The trial court also heard evidence that Father (1) exhibited a pattern of behavior that presented a substantial risk of harm to the children; (2) failed to provide the children with a safe and stable home at any point; (3) failed to complete any services; and (4) used narcotics. *See E. D. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-25-00526-CV, 2025 WL 3687988, at *4–6 (Tex. App.—Austin Dec. 18, 2025, no pet.) (mem. op.) (concluding the evidence was sufficient to support the trial court's finding under subsection (E) where the trial court heard evidence that the father exhibited a pattern of behavior presenting a substantial risk of harm to the children, had never provided much financial assistance, could not provide a safe and stable home for the children, and could not provide the Department with a suitable alternative placement).

"[M]ere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child." *In re N.L.S.*, 715 S.W.3d at 765 (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d at 533). But "[a] parent's criminal history—taking into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists—can support a finding of endangerment." *In re J.F.-G.*, 627 S.W.3d at 313 (citing *In re J.O.A.*, 283 S.W.3d at 345–46). "Imprisonment thus 'is certainly a factor' the trial court may weigh when considering endangerment. *Id.* (citing *Boyd*, 727 S.W.2d at 533).

As to Father's criminal activity, by his own admissions, he had been mostly absent from his children's lives for the "past nine years" because he had been incarcerated, he had been to prison twice before, he was arrested on "November 13th" for "possession of less than a gram," he ran from a halfway house when K.L.G.-3 was around one year old, and the Judgment of Conviction reflects that he was convicted for "Solicitation [o]f [a] Minor" with a five-year term of imprisonment imposed on May 28, 2025. In other words, both before and after his children's removal, Father has exhibited a pattern of behavior that presented a substantial risk of harm to the children in that his criminal activity resulted in his incarceration spanning over a decade. *See In re N.L.S.*, 715 S.W.3d at 765 ("Although half of Father's crimes occurred before N.L.S.'s birth, courts may consider a criminal record beginning before a child's birth as evidence of an endangering course of conduct. And Father's endangering course of conduct continued after N.L.S. was born, with Father continuing to engage in criminal behavior resulting in incarceration." (citation modified)). Moreover, Valenzuela testified that Father's current conviction for which he is imprisoned is a "safety concern" itself.

17

Next, as to safe and stable housing, even crediting Father's testimony that he was attempting to fix a home from "behind four walls," the trial court also heard testimony from Valenzuela that Father lived at that location at some point during the case before he had to leave and following that, Father became homeless before his most recent incarceration. *See In re R.R.A.*, 687 S.W.3d at 281 (holding that legally sufficient evidence supports the trial court's determination that Father's conduct endangered the children under (D) and (E) after explaining in part that the "court of appeals should not have ignored the aggregate weight of Father's ongoing drug use, homelessness, employment instability, and near-complete abandonment of his children for the six months preceding trial."); *In re T.R.*, 2026 WL 958570 at *15 ("As the factfinder, the trial court was free to credit the caseworker's testimony and disbelieve [the parent's] explanation." (citation modified)). Additionally, even if Father's biological mother's home had enough room for the children, Father left after "domestic incidences."

Next, Valenzuela testified that Father failed to complete any of his services. *See In re Y.B.*, No. 06-25-00049-CV, 2025 WL 2885861, at *4 (Tex. App.—Texarkana Oct. 10, 2025, no pet.) (mem. op.) ("In our analysis under Ground E, we may also consider a parent's failure to complete relevant requirements of a family service plan."); *In re A.L.H.*, 624 S.W.3d at 57 (explaining that a parent's failure to complete a service plan may qualify as an endangering course of conduct). And while Father cited his car accident for the reason he could not complete his services, the trial court also heard testimony that his parenting classes were offered in person *or* online and that his biological mother offered to take him to his services.

Next, Father acknowledged that during the nine years that he was primarily out of the children's lives he used cocaine, marijuana, and alcohol. *In re R.R.A.*, 687 S.W.3d at 281 ("When a pattern of drug use is coupled with credible evidence of attendant risks to employment, housing, and prolonged absence from the children, a factfinder reasonably can find endangerment to the child's physical or emotional well-being under (D) and (E)."). The apparent attendant risk here is Father's prolonged absence at a time when the children obviously needed him. *See id.* Finally, White believed that Father posed an emotional danger to the children.

Based on the foregoing and giving due deference to the trial court's findings and the appropriate standards of review, we conclude that the trial court could have formed a firm belief or conviction that Father knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being and engaged in a conscious course of conduct including not only acts but also omissions or failures to act that endangered the children. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E). Accordingly, the evidence was legally and factually sufficient to support the challenged statutory grounds for termination, and we overrule Father's two issues.

### III.    CONCLUSION

The trial court's judgment is affirmed.

JENNY CRON
Justice

Delivered and filed on the
30th day of April, 2026.